IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 4, 2003 Session

## STATE OF TENNESSEE v. JERRY RAY DAVIDSON

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Dickson County**
**No. CR2232     Allen Wallace, Judge**

---

**No. M1998-00105-SC-DDT-DD - Filed October 20, 2003**

---

The defendant, Jerry Ray Davidson, was convicted of premeditated murder and aggravated kidnapping. He was sentenced to death for the premeditated murder and to a consecutive sentence of twenty years for the aggravated kidnapping. The Court of Criminal Appeals affirmed the convictions and the sentences. Thereafter, the case was automatically docketed in this Court pursuant to Tennessee Code Annotated section 39-13-206(a)(1). We entered an order designating the following issues for oral argument:[1] (1) whether the trial court committed reversible error in denying the defendant's motions for change of venue and for additional peremptory challenges; (2) whether the trial court committed reversible error in refusing to strike the venire; (3) whether the evidence is sufficient to sustain the defendant's convictions; (4) whether the trial court committed reversible error by admitting the testimony of Darla Harvey; (5) whether the sentencing verdict form was incomplete and erroneous; and (6) all issues mandated by Tennessee Code Annotated section 39-13-206(c)(1). Having carefully reviewed these issues and the remainder of the issues raised by the defendant, we find no merit to his arguments. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) (1997); Judgment of the Court of Criminal Appeals**
**Affirmed**

JANICE M. HOLDER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and WILLIAM M. BARKER, JJ., joined. E. RILEY ANDERSON, J., filed a dissenting opinion, joined in part by ADOLPHO A. BIRCH, JR., J., who also filed a dissenting opinion.

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument . . . ." Tenn. R. Sup. Ct. 12.2.

Brock Mehler, Nashville, Tennessee (on appeal), Michael J. Love (trial and appeal), and Collier W. Goodlett (trial only), Clarksville, Tennessee, for the appellant, Jerry Ray Davidson.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General (on appeal); and Dan Alsobrooks, District Attorney General (trial only), for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

Between 8 and 9 p.m. on September 26, 1995, the victim, Virginia Jackson, and her dog arrived in a taxi cab at Bronco's Bar in Dickson, Tennessee. Jackson was carrying a large purse and a white bed pillow and wearing multicolored hair clips. When Jackson arrived at Bronco's Bar, the defendant, Jerry Ray Davidson, was sitting quietly by himself drinking beer. Jackson spent the next several hours at the bar drinking two beers and talking with the bartender, Carol Owens, and other bar patrons. Although Jackson and Davidson sat next to one another at one point, the two did not converse, and the evidence does not suggest that they were acquainted. By closing time, only Jackson, Davidson, and Owens remained in the bar. Owens tried to call a cab for Jackson, but the cab company was closed for the night. Jackson accepted a ride home from Davidson and was last seen alive around 11:30 p.m., carrying her purse and pillow as she got into Davidson's red pickup truck with her dog.

Members of Jackson's family became worried when they did not hear from her for several days. On October 1, 1995, her family filed a missing person report with law enforcement officials, who began an investigation of her disappearance.[2]

On September 30, 1995, only a few days after Jackson was last seen, Jackson's brother-in-law observed a pile of clothing lying along a farm road leading to her house. At that time, he did not connect the clothing with her disappearance. On October 18, however, he reported the clothing to law enforcement authorities. On October 18 and 19, law enforcement officers found the following items belonging to Jackson along the farm road: hair clips, a cell phone, panties, a pillow, a sweatshirt, and a sock. On October 19, 1995, two deer hunters found Jackson's decomposing, nude body. The body was partially buried in a shallow grave several miles from her house in a wooded area off an old logging road along the Houston/Dickson County line.

At trial, the condition of Jackson's body was described by Dr. Murray Marks, the forensic anthropologist who disinterred the body, and by Dr. Charles Harlan, the forensic pathologist who performed the autopsy on the body. Dr. Marks stated that the body was found lying chest down. The head was missing, although it appeared that a space had originally been dug for it in the grave. Part of the torso and left arm of the body were exposed, and the left hand was missing. There was

---

[2] Jackson's dog was found at her home.

evidence that animals had gnawed on the left arm, the neck, and the shoulder area. However, other trauma to the body was inconsistent with animal activity. Dr. Harlan observed that the skin at the front and back of the neck had been cut; the trachea exhibited a clean, sharp cut; the hyoid bone, which is located in the upper throat, had also been cut; and there was clear disarticulation of the cervical vertebral column. In addition, the torso, including the breast bone, had been cleanly cut open with some type of sharp instrument. This incision ran almost the entire length of the torso from the sternum to the navel and exposed the internal organs. Several superficial cuts had been made in the soft tissue next to the large incision. Dr. Harlan opined that both the major incision and the lesser cuts were inflicted after death. Toxicology tests revealed the presence of alcohol and Prozac in the body, although the quantity of these substances was not determined. According to Dr. Marks, it was possible that Jackson's neck had been cut and her head removed after death by either animal or human activity. Dr. Harlan opined that a human being, not an animal, had removed the head after death. Relying on changes in the body's color and texture, Dr. Marks concluded that Jackson had been dead for four to six weeks. Based on the degree of the body's decomposition, Dr. Harlan testified that death had probably occurred within twenty-four hours of Jackson's departure from Bronco's Bar on September 26, 1995. A cause of death could not be determined from Jackson's remains. Dr. Harlan, however, expressed his belief that her death was a result of homicide and that she could have died from wounds to her neck or head.

All of the evidence regarding Davidson's role in the killing is circumstantial. For example, Davidson was a janitor in a hospital department where surgical instruments were cleaned. Although he had been a good and reliable employee, he did not return to work as scheduled after September 26, 1995. He did not contact anyone at work about his absence, and he was eventually fired. In addition, he did not return to his residence at his mother's home for almost three weeks after Jackson's disappearance. On October 2, 1995, Davidson's mother informed the Dickson police that he was missing. Mrs. Davidson withdrew the missing person report on October 8, 1995, after Davidson telephoned her. Davidson later returned to his mother's house, once spending the night, and a second time retrieving a camper top for his pickup truck.

There was also evidence that Davidson was in the area where the body was found in the days following Jackson's disappearance. Between October 4 and 6, 1995, approximately a week after Jackson disappeared, Melinda Jones saw Davidson driving a red truck very slowly down Old Yellow Creek Road in Dickson County. Jones saw an object in the passenger seat that was tightly wrapped in a white sheet and was about as high as Davidson's shoulder. As the truck went by, Jones saw the white object fall over onto Davidson, who pushed it away. Later that evening, Jones observed the same truck traveling in the opposite direction at a high rate of speed. Jones also testified that she remembered seeing the same truck go down the road a few days to a week earlier, shortly after Jackson disappeared. At that time, the truck was going very slowly, and Jones, who was able to see inside the vehicle as it passed, noticed that "there was something that wasn't right about the passenger's seat." Jackson's body was discovered about one and a half miles from Jones's home.

Additionally, between October 2 and 6, 1995, around 8 to 9 a.m., Davidson came into Kim's One Stop Market not far from Jones's home. He was wearing work pants and was covered with dirt

3

to his waist. According to one witness, Davidson looked "like he'd been digging in like a garden or something." Davidson sat in the store drinking a cup of coffee for about an hour before driving away in a red pickup truck with a camper top. A week later he returned to the market to purchase a soft drink.

The State's proof also showed that on September 29 and 30, 1995, Davidson made purchases at a grocery store and at a Wal-Mart in Waverly, Tennessee, in the county just southwest of the area where Jackson's body was found. On October 4, 1995, around the time Melinda Jones saw Davidson driving his truck down Old Yellow Creek Road, Davidson also made a withdrawal from an automatic teller at a bank in Erin, Tennessee, in Houston County. All of these transactions place Davidson in the vicinity where Jackson's body was found at a time shortly after her disappearance.

Other sightings of Davidson after Jackson's disappearance also connect him with the killing. For example, on October 9, 1995, Davidson reappeared at Bronco's Bar in Dickson. When Owens, the bartender, asked him where he had taken Jackson on September 26, 1995, Davidson told her that he had dropped Jackson off at a Kroger grocery store. Later that same day, when Timothy Eads of the Dickson County Sheriff's Department went to Bronco's Bar to speak with Owens, Davidson was still there. After Owens identified Davidson as the man who had taken Jackson home, Eads questioned Davidson about Jackson for several minutes. Davidson informed Eads that he had left Jackson at the Kroger parking lot around midnight. Davidson appeared nervous and uncomfortable during his conversation with Eads and left the bar soon after Eads. When Eads tried to contact Davidson again, Davidson could not be located. On October 18, 1995, Eads executed a search warrant at Davidson's residence. He seized an expended 20-gauge shotgun shell that was later determined to have been fired from a shotgun found in Davidson's truck.

On October 12, 1995, Davidson came into the Lakeview Tavern in Cumberland City and ordered a beer. The bartender, Darla Harvey, testified that his pants and shoes were covered with dirt. For over an hour, Davidson sat in the bar and stared at Harvey while sipping his beer. Disturbed by Davidson's appearance and behavior, Harvey went outside and examined Davidson's truck. At that time, the bed of the truck was covered with a camper top that had been spray painted red everywhere but the back window. Harvey looked inside the camper and saw a dirty sleeping bag, a dirty shovel, a chain, and two Rubbermaid containers. According to Harvey, the truck was "very messy," as if Davidson had been living in it. Harvey informed some of the bar patrons that she was afraid of Davidson, who then left the bar at the patrons' request.

On October 19, 1995, Davidson was arrested at Robert's Creek Bar near Cuba Landing in Humphreys County. At the time of the arrest, Investigator Ted Tarpley spoke with Davidson. Davidson denied giving Jackson a ride on September 26. After Officer Eads joined the interrogation, Davidson changed his story and stated that he had left Jackson at the Kroger parking lot before driving to Nashville. He claimed that he stayed in Nashville until 3 or 4 a.m., returned home, and then left the next morning for East Tennessee. Eads and Tarpley did not inform Davidson that Jackson's body had been found. When asked to hypothesize about what might have happened to Jackson, Davidson responded, "Maybe somebody got her and chained her to a tree." Davidson also

4

told Eads and Tarpley that they might find Jackson with her head and hands missing to keep anyone from identifying the body. After Davidson was informed that the body had been found, he was asked what he had done with the head, and he replied, "I haven't told you that I killed her yet." Davidson later said that he might have something to say but could not say it yet. He also told the officers that he had quit his job because "things were just getting tense" and he decided to leave.

Searches of Davidson, his truck, and the area where the body was discovered yielded several items linking him to the killing. On his person, the arresting officers found a .25 caliber automatic pistol, a chrome knuckle knife with the blade open, a pair of handcuffs, a box of .25 caliber bullets, and a live 20-gauge shell. The pistol was loaded and ready to fire. At the time of his arrest, Davidson's truck did not have a camper top on it. His truck appeared to have been driven through mud and vegetation. Moreover, the truck contained the following items: an Ozark Trails tent, two shotguns, a knife, handcuff keys, clothing, flashlights, cans of red spray paint, and Marlboro cigarettes. Officers also found numerous items at the campsite or grave site[3] that belonged to either the defendant or to Jackson. The items included a box for an Ozark Trails tent, shells that had been fired from the shotgun found in Davidson's truck, a knife, handcuffs that matched the keys discovered in the Davidson's truck, packages and fragments of Marlboro cigarettes, a tool box resembling one previously seen on Davidson's truck, cans of red spray paint, clothing and flashlights similar to those in Davidson's truck, and two receipts reflecting a withdrawal from Davidson's bank account on October 4, 1995, at an automatic teller in Erin, Tennessee. Personal items belonging to Jackson, such as her sandals, billfold, a hair clip, a brush, a prescription bottle, and cigarette case, were found at the campsite as well.

In addition, the bottom of the passenger seat in Davidson's truck had been cut out. A chain and padlock found around the passenger seat were arranged in such a manner that they could be used to restrain a passenger. Blood on the passenger seat and head rest tested positive for human blood. DNA testing indicated that the blood samples from the truck did not match Davidson's DNA. Instead, the samples were consistent with Jackson's DNA. According to a report from LabCorp, Inc., only one in 265,000 people would be expected to have DNA matching that of Jackson.

The defense presented evidence attempting to counter the prosecution's circumstantial evidence. There was testimony that two tires on Jackson's truck had been punctured by a knife about two days before she disappeared. In addition, a forensic pathologist who testified for the defense criticized the manner in which the State's forensic pathologist had performed the autopsy and preserved the body. The defense pathologist also complained that the quantity of alcohol and Prozac in Jackson's body should have been determined. The defense introduced Jackson's medical records reflecting her hospitalizations between 1978 and 1995 for depression and drug and alcohol abuse in an attempt to show that Jackson might have died from an overdose of alcohol and/or Prozac. Her medical records include a report that she had once overdosed on the drug Soma and had been

---

[3] For purposes of investigation, the general location where the body and other evidence was found was broken down into two areas: the grave site area where the body was actually found and the campsite area across the logging road from the grave.

pronounced dead. In addition, a bottle labeled for a prescription for thirty pills of Prozac dispensed on September 25, 1995, contained only five tablets when found at Jackson's home after her disappearance. To counter the inference that Davidson could have used a surgical instrument from his workplace to cut Jackson's body, the defense presented testimony that no surgical instruments had been reported missing from Davidson's place of employment. Finally, the defense presented the testimony of a DNA expert who was unable to corroborate the findings of the State's experts. The expert challenged the opinion that the DNA test ruled out Davidson as the source of the blood found on the passenger seat of his truck. The defense expert admitted, however, that she had made no independent examination or analysis and was only reviewing LabCorp, Inc.'s findings.

At the conclusion of the evidence, the jury convicted Davidson of first degree premeditated murder and aggravated kidnapping.[4] The trial then moved to the sentencing phase to determine the punishment.

During the sentencing phase, the State presented proof that Davidson had been convicted in 1971 for assault and battery with the intent to commit rape, in 1976 for assault and battery with the intent to ravish and to have unlawful carnal knowledge of a female over 12 years of age, and in 1983 for felonious crime against nature and for felonious sexual battery. A Tennessee Bureau of Investigation agent testified that Jackson's body had been mutilated by cutting the neck area and torso. Photographs showing the mutilation were re-introduced.

In mitigation, the defense presented the testimony of Davidson's mother, several of his co-workers, and his minister. Davidson's mother related that, as a child, he had lived with his grandparents and had not completed school because he was always in trouble with the law. She described her son as a quiet boy who had few friends. He had no contact with his father throughout

---

[4] In this case, the defendant was indicted on charges of premeditated murder and felony murder. The trial court instructed the jury that it could find the defendant guilty of count 1 (premeditated murder) or count 2 (felony murder), but not both. As we explained in State v. Howard:

> While it was not error for the trial court to deliver sequential jury instructions, we have previously urged trial courts to allow juries to consider all theories of first-degree murder. We are compelled to emphasize this point again: a trial court should instruct a jury to render a verdict as to each count of a multiple count indictment which requires specific jury findings on different theories of first-degree murder. If the jury does return a verdict of guilt on more than one theory of first-degree murder, the court may merge the offenses and impose a single judgment of conviction. The benefits of instructing the jury in this manner are important. First, the double jeopardy problem of retrying a defendant after a subsequent appellate opinion reverses a conviction as unsupported by evidence is precluded. Second, the State will have a basis to protect other convictions to which it may be entitled. Third, in light of our decision in State v. Middlebrooks, 840 S.W.2d 317 (1992), a jury verdict on each charged offense will allow the State to use the felony murder aggravator as an aggravating circumstance in sentencing.

30 S.W.3d 271, 275 n.4 (Tenn. 2000) (citations omitted).

his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. Davidson's mother testified about how badly Davidson had taken his younger brother's death in Vietnam and how he had helped her at home. Next, several of Davidson's co-workers testified that he was a good worker, a good friend, and a nice, considerate man who would help anyone. They found Davidson's involvement in Jackson's murder inconsistent with his behavior when he was around them. The last witness for the defense was Joe Ingle, a minister, who described Davidson as quiet and passive, with an interest in the Bible's prophetic books and an openness to learning new things. Ingle opined that Davidson would not be a threat in prison and would participate in work or educational programs.

Based on this proof the jury found that the State had proven beyond a reasonable doubt the following statutory aggravating circumstances: (1) the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed by the defendant while in the commission of a kidnapping; and (3) the defendant knowingly mutilated the body of the victim after death. Tenn. Code Ann. § 39-13-204(i)(2), (7), (13) (1991 & Supp. 1995). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Davidson to death for the murder of Virginia Jackson.

## ANALYSIS

### Change of Venue

Davidson filed a pre-trial motion for a change of venue in April 1997, and the trial court conducted a full evidentiary hearing. Davidson presented articles from the Tennessean, the Nashville Banner, and the Dickson County Herald newspapers that had appeared from October 1995 to June 1996, as well as a videotaped newscast from a Nashville television station that had aired in January 1997. He argued that the news accounts had reported information about the discovery of Jackson's body, the details of the crime, and his prior criminal behavior, including his convictions for sexual offenses. Davidson further argued that media coverage often mentioned this case and Jackson's name in connection with proposed legislation for monitoring convicted sex offenders. Davidson argued that the media coverage also reported information about Jackson's "prominent family," which included the founders of a local hospital, a probate judge, and a state representative. Davidson asserted that the information had been disseminated so widely and was so prejudicial that a fair trial could not be held in Dickson County.

The State argued that Davidson failed to establish grounds for a change in venue and presented the testimony of a criminal investigator and a court clerk who had conducted "informal" surveys in Dickson and Cheatham Counties. These individuals approached numerous adult citizens, presumably at random, and asked several questions designed to gauge the citizens' level of familiarity with the defendant, the victim, and the pending murder charge. Both witnesses testified that the majority of persons they interviewed in Dickson and Cheatham Counties had formed no

opinion with respect to the pending trial against Davidson. Although many individuals knew that Jackson had been killed, most did not recognize Davidson's name. The State also presented several witnesses, including the Dickson County Sheriff, who opined that a fair trial could be conducted without a change of venue.

The trial court entered a detailed written order stating that it had considered the evidence introduced at the evidentiary hearing and had analyzed a number of factors with respect to venue. See State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979) (enumerating seventeen factors that are relevant in determining whether a change in venue is necessary). In denying the motion, the trial court found:

> While the severity of the offense charged is very grave and is capable of being sensationalized, the defendant has presented no evidence that this has occurred. Likewise, there has been no evidence presented of any threats, demonstrations, or other hostility against the defendant . . . .
>
> . . . .
>
> While the defendant did produce evidence of publicity, he presented no affidavits or other evidence that this publicity affected or infected the community. While this court declines to give substantial weight to the State's surveys, the State also provided testimony from various county officials that a jury could be obtained in Dickson County. In the court's opinion, the evidence is insufficient to show that venue should be changed at this time.

We begin our analysis with the familiar principle that a criminal offense shall be prosecuted in the county where the offense was committed, unless otherwise provided by statute or court rule. See Tenn. R. Crim. P. 18(a). Venue may be changed on motion of the defendant "if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a); see also State v. Dellinger, 79 S.W.3d 458, 481 (Tenn. 2002) (appendix). A motion for a change of venue shall be accompanied by affidavits alleging the facts that constitute "undue excitement" or other grounds. Tenn. R. Crim. P. 21(b).

The fact that a juror has been exposed to pre-trial publicity does not by itself warrant a change in venue. See State v. Mann, 959 S.W.2d 503, 532 (Tenn. 1997). A court must instead consider a number of factors, including the nature and extent of pre-trial publicity, the degree of publicity in the area from which the venire will be drawn, the existence of hostility or demonstrations against the defendant, and the length of time between the pre-trial publicity and the trial. See Hoover, 594 S.W.2d at 746. A court must also consider the *effect* that pre-trial publicity may have on jury selection. See id. Relevant factors in this regard include the size of the area from which the venire will be drawn, the potential jurors' familiarity with the pre-trial publicity, the effect on

8

potential jurors shown during jury selection, and the defendant's use of peremptory challenges and for-cause challenges. See id.

The trial court has the discretion to determine whether to grant a change of venue, and its decision will be reversed only for a clear abuse of discretion. See Dellinger, 79 S.W.3d at 481. Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish "that the jurors who actually sat were biased and/or prejudiced." Id.; see also Mann, 959 S.W.2d at 532.

The record demonstrates that the trial court did not abuse its discretion in denying Davidson's motion for a change of venue. The trial court considered numerous relevant factors and determined that the nature and conduct of the pre-trial publicity was informative but not sensational or unfairly prejudicial. Moreover, although the news accounts affected the area in which the venire was later selected, the trial court found that most of the pre-trial publicity occurred several months before the trial and was not prejudicial or pervasive either shortly before or during the trial.

The record also demonstrates that the trial court conducted a meticulous and detailed jury selection process from August 4 to August 19, 1997. The voir dire examination involved over two hundred potential jurors. As Davidson asserts, approximately twenty percent of the jurors knew of his prior criminal record, and ten percent of the jurors were familiar with Jackson's family. The trial court, however, removed nearly half of the venire by excusing for cause all potential jurors who could not set aside their opinions of the case.

Finally, the record does not support Davidson's contention that two of the jurors were actually prejudiced against him. Joy Anderson stated during voir dire that her younger brother was a friend of Jackson's son. She clarified, however, that she would not "lean one way or the other" if selected to serve as a juror and that her son's relationship with Jackson's family would not influence her in any way. Similarly, Myra Sensing said during voir dire that she had known Jackson several years earlier and that her mother had worked with Jackson's aunt. Sensing also stated that she had read news accounts indicating that Davidson had mental health problems and had been a "sex offender." Upon additional questioning, however, Sensing clarified that her knowledge of Jackson's family would not affect her "decision making" if she was selected to serve as a juror and that she would base her decision solely on the evidence at trial.[5]

An individual examined during voir dire is not required to have a complete lack of knowledge of the facts and issues to be selected as a juror. See State v. Pike, 978 S.W.2d 904, 924

---

[5] Davidson did not challenge Sensing for cause on this basis but did challenge her participation for cause based on her views on the death penalty. Although Sensing stated that she believed in capital punishment in "certain circumstances," her responses clarified that she would consider the circumstances of the case, follow the applicable law, and render a verdict based on the evidence. She said that she would not vote for the death penalty automatically. Accordingly, the trial court did not err in refusing to excuse her for cause on this basis. See Wainwright v. Witt, 469 U.S. 412, 424 (1985) (removal for cause only when "the juror's views would prevent or substantially impair the performance of [the juror's] duties").

(Tenn. 1998) (appendix). As the United States Supreme Court has said, it is "sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723 (1961); see also Mann, 959 S.W.2d at 531 (recognizing that jurors may be selected to hear a trial if they are able to set aside an opinion and render a verdict based on the evidence in court).

The voir dire examination demonstrated that neither Anderson nor Sensing was prejudiced against the defendant or biased in favor of Jackson or her family. Indeed, Davidson did not challenge either juror for cause on this basis.[6] Moreover, Anderson and Sensing both clarified that their decisions would not be affected by any influence or information outside of the courtroom and that they would base their decisions solely on the evidence presented at trial. See Mann, 959 S.W.2d at 531. In sum, Davidson has failed to show that either Anderson or Sensing was actually prejudiced or biased against him.

Accordingly, the record shows that the trial court held an extensive evidentiary hearing and considered numerous relevant factors in determining whether to grant a change of venue. The trial court also conducted a lengthy and detailed voir dire process that was devoted to determining the nature and extent of exposure to media coverage of the defendant and victim as well as its potential effect on the views of the potential jurors. There is no evidence that any juror was actually biased or prejudiced against Davidson. We therefore conclude that the trial court did not abuse its discretion in denying Davidson's motion for a change of venue.

### Selection of Venire

The relevant statutory provisions governing the selection of the jury venire or a special jury venire are established in Tennessee Code Annotation section 22-2-302 and related sections. As relevant to this case, the provisions require the board of jury commissioners to select qualified persons "from each district in the county and in proportion to the population of such districts, as near as may be, to serve as jurors in the circuit and criminal courts of such county . . . ." Tenn. Code Ann. § 22-2-302(a)(1) (1994). Although minor or inadvertent deviations from the statutory jury selection provisions may not warrant a reversal of a conviction, we have emphasized that the courts "will not sanction flagrant and unnecessary deviations." State v. Bondurant, 4 S.W.3d 662, 670 (Tenn. 1999); see also State v. Lynn, 924 S.W.2d 892, 898 (Tenn. 1996) (holding that the selection of a special venire was an improper and unnecessary deviation from the statutory procedures).

The record reflects that Sue Zwingle, the Criminal and Circuit Court Clerk for Dickson County, testified that the venire was randomly selected by a computer from a list of every licensed

---

[6] In a related issue, Davidson argues that the trial court erred by denying his motion for additional peremptory challenges and that the error was prejudicial because it allowed Anderson and Sensing to participate as jurors. Davidson has not claimed that he was denied the fifteen peremptory challenges permitted in capital cases by Rule 24(d) of the Tennessee Rules of Criminal Procedure, and he has cited no authority for the trial court to grant additional peremptory challenges. See Ross v. Oklahoma, 487 U.S. 81, 89 (1988) (holding that the right to peremptory challenges is "denied or impaired" only when a defendant does not receive that which the state law permits).

driver over eighteen years of age in Dickson County. Although she did not determine the population spread among the districts in Dickson County, Zwingle testified that the method of selecting the venire was in accordance with her training, experience, and discussions with judges. Davidson introduced no further evidence.

The trial court denied relief after finding that Davidson had introduced no evidence to establish the number of persons selected from each district and no evidence to establish that the number of persons selected from each district was disproportionate in any way. The issue apparently was not addressed by the Court of Criminal Appeals.[7]

We conclude that the record supports the trial court's determination that Davidson failed to establish the number of persons selected from each district and that he failed to show that the selection in any district was disproportionate. Moreover, Davidson has not demonstrated any grounds for concluding that the selection procedures were a "flagrant and unnecessary" deviation from the statute. See Bondurant, 4 S.W.3d at 670. In sum, Davidson has failed to establish grounds for relief.[8]

### Sufficiency of the Evidence

### First Degree Premeditated Murder

Davidson contends that the State failed to prove that the victim's murder was premeditated.[9] In reviewing the sufficiency of the evidence, we must examine all of the evidence to determine whether any rational trier of fact could have found the element of premeditation beyond a reasonable doubt. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions regarding the credibility of witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. See id.

---

[7] It is not clear from Davidson's brief whether the issue was pursued solely on statutory grounds or as part of the pre-trial publicity issue. In either case, the issue is without merit for the reasons given in this opinion.

[8] On appeal, Davidson has presented an attachment to his brief that contains various statistics apparently taken from juror questionnaires. The State argues that the information was not presented to the trial court and that, in any event, the statistics establish that the venire selection was proportional. The State is correct that the information cannot be considered by this Court because it was not introduced as evidence in the trial court.

[9] At oral argument, Davidson's counsel stated that Davidson's "identity as the perpetrator" was not being challenged.

11

At the time of the offense, first degree murder included a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991 & Supp. 1995). The statute defined premeditation as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1991 & Supp. 1995). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).

Because premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence. See State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). We have previously identified several circumstances that may warrant the trier of fact to find or infer premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing. See Bland, 958 S.W.2d at 660; Pike, 978 S.W.2d at 914-15. These factors, however, are not exhaustive. See Bland, 958 S.W.2d at 660; Pike, 978 S.W.2d at 914-15 (stating that these are but some of several factors that may be considered on the issue of premeditation). A jury is not limited to any specific evidence when determining whether a defendant intentionally killed the victim "after the exercise of reflection and judgment." See Tenn. Code Ann. § 39-13-202(d) (1991 & Supp. 1995). The factors listed in Bland and other cases simply serve to demonstrate that premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d).

Although the question is close in this case, we believe that the evidence is sufficient for a rational trier of fact to have found the element of premeditation beyond a reasonable doubt. Several facts support a finding of premeditation when viewed cumulatively in the light most favorable to the State. See State v. LaChance, 524 S.W.2d 933, 937 (Tenn. 1975) (looking at the entire pattern of the defendant's conduct in determining whether evidence of premeditation is sufficient).

While there is no direct evidence that Davidson intended to kill Jackson when they left the bar together on the night of September 26, 1995, circumstantial evidence supports the jury's verdict. It is undisputed that Davidson sat quietly near Jackson for approximately three hours before offering her a ride home. It was reasonable for the jury to infer that during this time Davidson became aware that Jackson had no means of transportation and that Davidson remained in the bar after all other patrons had left, waiting to offer Jackson a ride in order to kidnap and murder her. Evidence that hair clips, a cell phone, panties, a pillow, a sweatshirt, and a sock, all belonging to Jackson, were strewn across a field near her home supports a finding that there was a struggle between Davidson and Jackson. The search of Davidson's truck revealed two sets of handcuffs and a chain with a padlock around the passenger seat. Blood consistent with Jackson's was also found on the passenger seat. Furthermore, Davidson told the police that Jackson may have been chained to a tree. From all of this evidence, the jury could have reasonably inferred that Davidson left the bar with a preconceived plan, handcuffed and chained Jackson to the passenger seat in his truck, drove her to a secluded location, again restrained her, and then killed her.

While the precise cause of Jackson's death was undetermined, the search of Davidson and his truck yielded a veritable arsenal of weapons including knives, shotguns, a .25 caliber pistol, and numerous rounds of live and spent ammunition. Shotgun shells found in the truck and at the campsite were determined to have been fired from one of the shotguns in Davidson's truck. In contrast, there was no evidence that suggested Jackson was armed or in possession of a weapon when she was killed. See Bland, 958 S.W.2d at 660 (mentioning use of a weapon upon an unarmed victim as a circumstance relevant to premeditation).

The jury could also have inferred premeditation from Davidson's treatment of Jackson's body in this case. The mutilation of the body, particularly the slicing of Jackson's torso from the neck to the abdomen, indicates that the killing was motivated by a desire for some sort of gratification and was not a rash or impulsive killing. See Tooley v. State, 448 S.W.2d 683, 687 (Tenn. Crim. App. 1969) (concluding that horrible mutilation of victim was circumstance from which premeditation could be inferred). Davidson's calculated behavior during his interrogation by law enforcement, described by a witness as a "cat-and-mouse game," likewise is relevant to the question of premeditation in this case. Davidson first claimed, for instance, that he had simply given Jackson a ride to the Kroger parking lot. Later, unaware that Jackson's body had been found, Davidson coolly speculated that someone may have chained her to a tree and severed her head and hands to avoid identification of the corpse. When officers said they had found Jackson's body and asked Davidson what he had done with the head, he replied, "I haven't told you I killed her yet."

Accordingly, while no single piece of evidence was sufficient in and of itself to establish premeditation in this case, we believe that the facts and circumstances as a whole were sufficient for a rational trier of fact to have found the elements of premeditated first degree murder beyond a reasonable doubt. Davidson is not entitled to relief on this ground.

## Aggravated Kidnapping

The offense of kidnapping is committed when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." See Tenn. Code Ann. §§ 39-13-302, -303 (1991). The offense is aggravated when the victim suffers bodily injury. See Tenn. Code Ann. § 39-13-304 (1991).

When viewed in a light most favorable to the State, it is clear from the evidence discussed above that a rational trier of fact could find the elements of aggravated kidnapping beyond a reasonable doubt. The jury could have reasonably inferred from the proof presented at trial that Davidson handcuffed and chained Jackson to the passenger seat in his truck in order to prevent her escape before killing her. Furthermore, Davidson's suggestion that Jackson may have been chained to a tree also supports a finding that she was kidnapped. This issue is without merit.

## Testimony of Darla Harvey

The next issue raised is whether the trial court abused its discretion in admitting Darla Harvey's testimony regarding her opinions about Davidson when he came into the Lakeview Tavern two weeks after Jackson's disappearance. We note that Davidson concedes that Harvey's testimony regarding his activities while in the bar was admissible. However, he complains that it is cumulative to the testimony given by other witnesses about his habit of sitting and watching people. Davidson argues that Harvey's opinions were improper lay opinions in violation of Tennessee Rule of Evidence 701. He also contends that they were irrelevant and unfairly prejudicial under Tennessee Rules of Evidence 401 and 403.[10] The State asserts that any error was harmless.

Darla Harvey testified that on the afternoon of October 12, 1995, Davidson sat silently in the Lakeview Tavern and stared at her for over an hour while sipping a beer. She stated that she thought that Davidson's staring wasn't "right," made her "kind of wary," and led her to conclude that "something ain't right" and "this ain't working out too good." Harvey further testified that, as Davidson continued staring, she got a "gut feeling" that she should go outside and look at his truck. After examining Davidson's truck, she said to herself, "Good, I got me a nut." The defense's objection to this remark was sustained. Harvey testified that, after re-entering the bar, she was "bothered" when Davidson continued to stare at her and then went to the restroom and looked out the back door. She testified that, as Davidson remained in the bar, he made her "nervous," that she "felt real uneasy about the whole situation," and that his staring "was making [her] very uncomfortable." Harvey testified that it was "funny" and that "something wasn't right" when Davidson left the bar at one point to get a cigarette since he had just opened a pack of cigarettes. Harvey said that, when she saw Davidson get something out of his truck, she placed her gun close at hand and released the safety. She continued to believe that "something wasn't right" when

---

[10]Additionally, Davidson argues that admission of Harvey's testimony violated his rights to due process under Article I, sections 8 and 16 of the Tennessee Constitution and under the Eighth and Fourteenth Amendments to the United States Constitution.

Davidson returned because he did not speak to her when she addressed him and because he kept his hand in his pocket. Harvey stated that she had been ready to shoot Davidson if he had come any closer. She commented that she "just had a bad feeling, this guy wasn't making me feel right." Finally, Harvey testified that she felt so afraid at this point, that she urged some customers to ask Davidson to leave and that Davidson then left.

Under Tennessee Rule of Evidence 401 evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, Tennessee Rule of Evidence 403 excludes any relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Tennessee Rule of Evidence 701(a) provides:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Initially, we disagree that all parts of Harvey's testimony challenged by Davidson in this Court amount to lay opinion. While Harvey's testimony that "something ain't right" and that "this ain't working out too good" were opinions, her statements that she was "kind of wary," had a "gut feeling" or a "bad feeling," and was frightened, uneasy, and uncomfortable were not opinions but descriptions of her state of mind during the time that Davidson was in the tavern. This testimony was relevant to explain Harvey's examination of Davidson's truck. Furthermore, those portions of Harvey's testimony that are opinions were observations rationally based on her perception of the facts. See, e.g., Brown, 836 S.W.2d at 550 (stating that opinion testimony is admissible when it describes the witness's observations in the only way in which they can be clearly described). This testimony was helpful to the jury in understanding why Harvey acted as she did while Davidson was in the tavern. Harvey's statements were therefore relevant. See Cohen, Sheppeard & Paine, Tennessee Law of Evidence § 7.01[4][c] (4th ed. 2002) (stating that implicit in the requirement that lay opinion be helpful is the concept of relevance). Moreover, Harvey's assessment of Davidson's behavior was unlikely to result in any unfair prejudice. Therefore, we conclude that the probative value of this testimony outweighed any danger of unfair prejudice. We thus hold that the trial court did not abuse its discretion in admitting these portions of Harvey's testimony.

Furthermore, even if the challenged statements were inadmissible, in light of the entire record on appeal, we would conclude that any error in the admission of Harvey's statements would have been harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Several other witnesses testified concerning similar behavior by Davidson. This issue is without merit.

15

**Jury Verdict Form – Aggravating Circumstances**

Davidson next contends that the death sentence was invalid because the jury's verdict form did not establish that the jury found the aggravating circumstances relied upon by the State. The State argues that Davidson waived review of the issue by failing to object contemporaneously[11] and that, in any event, the verdict form was sufficiently clear to show that the jury found all of the aggravating circumstances beyond a reasonable doubt.

The State relied upon three aggravating circumstances in seeking the death penalty: (1) that the defendant had a prior conviction for a felony whose statutory elements involved the use of violence to the person; (2) that the defendant knowingly committed the murder in the commission of a kidnapping; and (3) that the defendant knowingly mutilated the body of the victim after death. See Tenn. Code Ann. § 39-13-204(i)(2), (7), (13) (1991 & Supp. 1995). The trial court instructed the jury on the precise statutory language of these aggravating circumstances.

In imposing the death penalty, the jury's verdict form stated: "We, the jury, unanimously find the following listed statutory aggravating circumstance[] or circumstances":

> (1)     Previously convicted of one (1) or more felonies, etc.
>
> (2)     The murder was knowingly committed, etc.
>
> (3)     The Defendant knowingly mutilated the body of the victim after death.

The verdict form concluded that "[w]e, the jury, unanimously find that the State has proven beyond a reasonable doubt that the aggravating circumstances so listed above outweigh any mitigating circumstances."

This Court has never held that the jury's verdict form must be an exact or verbatim statement of the statutory aggravating circumstances relied upon by the State. See State v. Bland, 958 S.W.2d 651, 661 n.6 (Tenn. 1997) (holding that "[t]he failure of the verdict to repeat the language of the statute defining the aggravating circumstance does not invalidate the jury's findings"). The jury's verdict must be sufficiently clear, however, to indicate that the jury has found the elements of the aggravated circumstance or circumstances relied upon by the prosecution. See State v. McKinney, 74 S.W.3d 291, 303 (Tenn. 2002). The verdict is sufficient where "the aggravating circumstances found are clearly those allowed by the statute and permit effective appellate review of the sentence." Id. at 304 (quoting State v. Teel, 793 S.W.2d 236, 250 (Tenn. 1990)).

---

[11] Although the State is correct that Davidson's failure to object waives review of the issue, we elect to review the merits of the issue. See State v. McKinney, 74 S.W.3d 291, 303 n.5 (Tenn. 2002).

16

We agree with the Court of Criminal Appeals' conclusion that the jury's verdict in this case established that the jury found the aggravating circumstances relied upon by the State in seeking the death sentence. The State relied upon three aggravating circumstances and the trial court's instructions to the jury tracked the precise statutory language of each of the three aggravating circumstances. Although the jury's verdict form did not specifically restate the precise statutory language, it plainly indicates that the jury found all three aggravating circumstances. Indeed, as the Court of Criminal Appeals observed, the verdict form's use of "etc." demonstrates that the jury found the exact aggravating circumstances upon which it had been instructed and then used a short, common term for incorporating the entire statutory language by reference. Indeed, any other conclusion would be unreasonable. See id. at 303-04.

This Court's decision in State v. Harris, 989 S.W.2d 307 (Tenn. 1999), upon which Davidson relies, is distinguishable. In Harris, we held that a sentencing verdict was error where the jury found that the murder was "especially heinous and atrocious" and did not recite the complete statutory language of "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." 989 S.W.2d at 313-14.[12] Moreover, the statements of the jury foreperson revealed that the jury *intended* to omit the remaining critical language of the aggravating circumstance, *i.e.*, "torture or serious physical abuse beyond that necessary to produce death." Id. at 314. We held that verdict was incomplete and erroneous under the circumstances of that case. See id. In contrast, there is no indication in this case that the jury intended to omit any elements of the aggravating circumstances or that it altered the aggravating circumstances to suit its findings. Accordingly, Davidson is not entitled to relief on this ground.

In a related argument, Davidson asserts that the death sentence was invalid because the verdict form did not state that the jury found the aggravating circumstances beyond a reasonable doubt.

The relevant statutory provision requires that the jury unanimously determine that at least one aggravating circumstance has been proven by the State beyond a reasonable doubt and that such aggravating circumstance or circumstances have been proven by the State to outweigh any mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(g)(1)(A), (B) (1991 & Supp. 1995). The statute further provides that if the sentence imposed is a death sentence, the jury shall "[r]educe to writing the statutory aggravating circumstance or statutory aggravating circumstances so found" and "[s]ignify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-204(g)(2)(A)(i), (ii) (1991 & Supp. 1995). Finally, the statute requires that the jury's verdict form substantially appear as follows:

> We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

---

[12] See Tenn. Code Ann. § 39-13-204(i)(5) (1991 & Supp. 1995).

17

> [Here list the statutory aggravating circumstance or circumstances so found.]
>
> We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.
>
> Therefore, we, the jury, unanimously find that the punishment shall be death.

Tenn. Code Ann. § 39-13-204(g) (Supp. 1995).[13]

As stated above, the jury's verdict form stated, "We, the jury, unanimously find the following listed statutory aggravating circumstance[] or circumstances," which it then listed. The verdict concluded, "We, the jury, unanimously find that the State has proven beyond a reasonable doubt that the aggravating circumstances so listed above outweigh any mitigating circumstances." Accordingly, the verdict mirrored and satisfied the relevant statutory language regarding the required jury verdict form in a death penalty case. See Tenn. Code Ann. § 39-13-204(g) (1991 & Supp. 1995).

In addition, the trial court's instructions to the jury emphasized the precise statutory requirements with respect to the State's burden of proof. For instance:

> Tennessee law provides that no sentence of death . . . shall be imposed by a jury but upon a <u>unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances</u> . . . .
>
> . . .
>
> Members of the Jury, the court has read to you <u>the aggravating circumstances which the law requires you to find beyond a reasonable doubt that the evidence was established</u>.
>
> . . .
>
> <u>If you unanimously determine that at least one statutory aggravating circumstance or several aggravating circumstances have been proven by the state, beyond a reasonable doubt</u>, and said circumstance or

---

[13] For reasons that are not clear from the statute, the statutory provisions governing life and life without parole sentences include the "beyond a reasonable doubt" language in the jury verdict form. See Tenn. Code Ann. § 39-13-204(f)(1), (2) (1991 & Supp. 1995). It would appear that the statutory verdict form for imposing the death penalty should be amended for uniformity.

circumstances have been proven by the state to outweigh any mitigating circumstance or circumstances, beyond a reasonable doubt, the sentence shall be death. The jury shall reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found, and signify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.

(Emphasis added). Accordingly, there is no doubt that the jury was instructed on the correct standards of proof and that its verdict complied with the controlling statutory provisions. See State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001) (providing that the jury is presumed to follow the trial court's instructions).

The trial court's detailed instructions to the jury and the use of the statutorily-required verdict form distinguish this case from our decisions in State v. Carter, 988 S.W.2d 145 (Tenn. 1999), and State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994). In Stephenson, the jury's verdict was facially void because the court gave conflicting instructions as to the applicable burden of proof and the sentencing verdict form omitted the applicable burden of proof. See Stephenson, 878 S.W.2d at 557-58. In Carter, the verdict forms also omitted the applicable burden of proof, and thus they were facially void, despite the jury having been given proper instructions. See Carter, 988 S.W.2d at 152. In contrast, it is clear that the trial court in this case properly instructed the jury and that the jury's verdict was based on the applicable law. Accordingly, Davidson is not entitled to relief based on this issue.

**Mandatory Review Factors**

In reviewing the mandatory review factors on appeal, we first note that there is no indication that the jury's imposition of the death sentence was arbitrary. See Tenn. Code Ann. § 39-13-206(c)(1)(A) (1997). Moreover, the evidence overwhelmingly supports the jury's findings with respect to the three aggravating circumstances. See Tenn. Code Ann. § 39-13-206(c)(1)(B) (1997). Specifically, Davidson had prior convictions for felonies whose elements involved the use of violence to the person, he committed the killing in the course of a kidnapping, and he knowingly mutilated the victim after the killing. See Tenn. Code Ann. § 39-13-204(i)(2), (7), (13) (1991 & Supp. 1995). Finally, the evidence supports the jury's determination that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206(c)(1)(C) (1997).

In a case where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tennessee Code Annotated section 39-13-206(c)(1). The purpose of the analysis is to identify aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "disproportionate to the punishment imposed on others convicted of the same crime." Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

Our comparative proportionality analysis employs the "precedent seeking" method, in which we compare the case under review with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 667. Although no two defendants or crimes are precisely alike, a death sentence is disproportionate only if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

The relevant pool of cases in our comparative proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). The pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. We previously have declined to review the exercise of prosecutorial discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases . . . . Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder. Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case.

Id. at 784 (citations omitted).

Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. See Bland, 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. See id.

The evidence in this case shows that Davidson met Jackson on September 26, 1995, after offering to give her a ride home from Bronco's Bar in Dickson, Tennessee. Davidson kidnapped and then killed the unarmed, unsuspecting victim. Jackson's body was later found in a remote location with lacerations and blunt trauma to her neck. Her head and left hand had been severed from her

body, and her torso had been sliced from navel to sternum. There was evidence that a struggle occurred between Jackson and Davidson. Jackson's clothing and belongings were found along a road near her house and blood matching Jackson's DNA was found in Davidson's truck. There was no evidence of provocation or justification for the killing.

At the time of his trial, Davidson was a 52-year-old white male who had three felony convictions for prior violent sexual offenses. Davidson did not cooperate with authorities or express remorse for the crime. To the contrary, he evaded responsibility by giving law enforcement officers conflicting statements. Davidson was later found in possession of numerous weapons and restraining devices. Items belonging to Davidson matched several items that were found near the victim's body.

We hold that the death sentence in this case is not excessive or disproportionate when compared to the penalty imposed in similar cases. For instance, this Court has upheld the death penalty in numerous cases involving killings in the course of a kidnapping. See State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000); State v. Hines, 919 S.W.2d 573 (Tenn. 1995); State v. Bates, 804 S.W.2d 868 (Tenn. 1991); State v. Alley, 776 S.W.2d 506 (Tenn. 1989); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989); State v. House, 743 S.W.2d 141 (Tenn. 1987); State v. King, 718 S.W.2d 241 (Tenn. 1986). The death penalty has also been upheld in similar cases in which a defendant has killed the victim and has either dismembered the victim's body or disposed of the body in a secluded location. See Terry v. State, 46 S.W.3d 147 (Tenn. 2001); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

Similarly, this Court has frequently upheld death sentences in cases where one of the aggravating circumstances was a prior conviction for a felony whose statutory elements involved the use of violence to the person. See State v. McKinney, 74 S.W.3d 291 (Tenn. 2002); State v. Stout, 46 S.W.3d 689 (Tenn. 2001); State v. Sims, 45 S.W.3d 1 (Tenn. 2001); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998); State v. Taylor, 771 S.W.2d 387 (Tenn. 1989); State v. Harries, 657 S.W.2d 414 (Tenn. 1983). Indeed, a prior violent felony is an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others." State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993); see also McKinney, 74 S.W.3d at 313. Many such cases have involved defendants whose prior felony convictions were for sexual offenses. See State v. Vann, 976 S.W.2d 93 (Tenn. 1998); State v. Nichols, 877 S.W.2d 722 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). Finally, we have upheld numerous death sentences in which the defendant was convicted of premeditated murder and the killing was committed in the course of a kidnapping. See State v. Powers, 101 S.W.3d 383 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000); State v. Bates, 804 S.W.2d 868 (Tenn. 1991); State v. Alley, 776 S.W.2d 506 (Tenn. 1989); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

Although we recognize and have considered that there are first degree murder cases in the applicable pool in which the defendant received a sentence less than death after a capital sentencing hearing, our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. McKinney, 74 S.W.3d at 313. Instead, our

review requires that we identify aberrant death sentences by determining whether a case "plainly lacks" circumstances found in similar cases in which the death penalty has been imposed. Godsey, 60 S.W.3d at 783. As we have explained, the facts of this offense, the nature of this defendant, and the aggravating and mitigating circumstances in this case reveal that this case does not plainly lack circumstances consistent with those in the numerous similar cases in which a death sentence has been upheld. Accordingly, the death sentence is not excessive or disproportionate as applied to Davidson.

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstances, that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Davidson and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Davidson's sentence of death is affirmed and shall be carried out on the 3rd day of March, 2004, unless otherwise ordered by this Court or proper authority. It appearing that the defendant, Jerry Ray Davidson, is indigent, costs of the appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, JUSTICE

22