IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2004

## STATE OF TENNESSEE v. PHILLIP LOWELL BLEDSOE

**Direct Appeal from the Circuit Court for Gibson County**
No. 16263    Clayburn L. Peeples, Judge

_____

**No. W2003-02867-CCA-R3-CD  - Filed August 9, 2004**

_____

The appellant, Phillip Lowell Bledsoe, was convicted by a jury in the Circuit Court of Gibson County of first degree premeditated murder and sentenced to life imprisonment. On appeal, the appellant contends that the evidence was insufficient to support his conviction of first degree murder. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Jeffrey A. Smith, Trenton, Tennessee, for the appellant, Phillip Lowell Bledsoe.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; Garry Brown, District Attorney General; and Jerald Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

In the early morning hours of February 10, 2002, Milan Police Sergeant Andrea Davis was on patrol when she observed the appellant and the victim arguing in the parking lot of the American Legion Post ("The Post"), a local nightclub. Sergeant Davis drove into the parking lot and asked if there was a problem. They responded that there was no problem and walked off. Sergeant Davis observed no weapons and overheard no threats. Nevertheless, she parked across the street at the Rock and Shirl nightclub "to keep an eye on the situation." Thereafter, the victim and Tyrone

Edwards walked down the street, and the appellant and his girlfriend, Tammy Peete, got into Tammy's vehicle and drove in the opposite direction.[1]

Approximately fifteen minutes later, Sergeant Davis responded to a call of a shooting at the intersection of Robinson Street and Ellis. When she arrived, Edwards was performing CPR on the victim, whose body was laying on the street. A crowd began to gather around the victim's body. At trial, Sergeant Davis testified that she observed Tammy's vehicle, a white Chrysler, parked on Robinson Street near the scene. She also observed Tammy and her brother, Jeremiah Peete, at the scene. Jeremiah approached Sergeant Davis to ask what happened. Sergeant Davis testified that she did not see the appellant at the scene. She related that Edwards was arrested at the scene for disorderly conduct. She further related that Greg Cook drove a green Pontiac Grand Prix.

Early that same morning, Dallas Emerson was driving his girlfriend home when he observed a body in the middle of the street at the intersection of Robinson Street and Ellis. Emerson observed Edwards attempting to help the injured individual. As Emerson approached the intersection, Edwards ran over to his vehicle and told him to call the police because "his partner had been shot." Emerson drove to a nearby store. As Emerson drove to the store, he observed a green Grand Prix "backing . . . down" Robinson Street. Emerson testified at trial that he had previously observed Greg Cook driving a green Grand Prix. At trial, Emerson related that he did not see the appellant that morning.

Jerry Hartsfield testified that in February 2002 he was employed by the Milan Police Department and investigated the victim's murder. Hartsfield related that shortly after the shooting he interviewed Edwards, who stated that "[the appellant] shot at [the victim] and missed and then shot again." After interviewing Edwards, Hartsfield went to Tammy's house to talk with the appellant. Hartsfield stated that he "did everything but beat the door down," but no one came to the door. Hartsfield testified that a nine-millimeter bullet casing was discovered at the scene and collected as evidence.

Hartsfield testified that he did not interview the appellant until the following day when the appellant surrendered at the Gibson County Jail. In his statement to Hartsfield, the appellant claimed that he had argued with the victim at The Post because the victim refused to pay the charge for reentering the nightclub. He told Hartsfield that approximately twenty minutes later as he was leaving the nightclub, the victim asked him if he "had a problem with him running in and out [of the nightclub]." The appellant informed the victim that upon reentering the nightclub he was required to pay a one dollar reentry fee. Shortly thereafter, the appellant observed the victim and Edwards walking away from the nightclub. According to the appellant, the victim and Edwards were arguing, and Edwards had a gun in the front of his pants. In his statement, the appellant denied seeing the victim and Edwards again that morning. The appellant claimed that he went home to sleep. The next morning, the appellant learned that he was suspected of shooting the victim. He immediately

---

[1] Because three witnesses share the last name "Peete," we have elected to utilize first names for the purposes of brevity. We intend no disrespect to these individuals.

left Milan and went to a hotel in Jackson, where he stayed until he observed a news report about the victim's murder. The appellant then decided to surrender to the authorities. In his statement, the appellant denied being in Cook's vehicle at the time of the shooting.

On cross-examination, Hartsfield acknowledged that he did not observe the appellant at the crime scene. He further acknowledged that he did not test the appellant's hands for gunpowder residue. However, he claimed that because he did not interview the appellant until the day after the shooting, any gunpowder residue would have likely been washed away.

Tyrone Edwards testified that on February 10, 2002, he and the victim went to The Post where the appellant was working the door. He and the victim argued with the appellant after the appellant told the victim that he had been barred from the nightclub. Despite being barred, the victim and Edwards entered the nightclub. Later, as they were leaving, they encountered the appellant in the parking lot. According to Edwards, they "almost got to fighting," but the police arrived. Thereafter, the appellant left with his girlfriend in her vehicle, and Edwards and the victim walked to the victim's house. After the victim stopped at his house, he and Edwards walked to the intersection at the end of the street.

As they approached the intersection, Edwards observed the white vehicle belonging to the appellant's girlfriend. Edwards told the victim that they should go home. Edwards began to walk towards his house, but the victim remained near the intersection. Edwards observed a green Grand Prix pull up behind the victim. The appellant and Greg Cook jumped out of the vehicle and began arguing with the victim. Edwards observed the appellant "pull out [a] pistol" and shoot once over the victim's head. The victim then attempted to take the pistol from the appellant. However, when the victim rushed the appellant, the pistol discharged, and the victim grabbed his side and fell to the ground. As the victim fell, Edwards observed Cook running towards him. Cook pulled a gun from his pants and shot at Edwards. The appellant and Cook then "took off." The appellant ran behind the victim's house, and Cook got into his vehicle and drove away. Edwards stopped a man driving a white Chevrolet and asked him to call the police. Edwards testified that neither he nor the victim had a weapon that morning.

Edwards testified that as a juvenile he had been a member of the Gangster Disciples. He further testified that at the time of the shooting, the victim, the appellant, and Cook were members of the Gangster Disciples. According to Edwards, the victim "was at odds with th[e] gang" because he no longer wanted to be a member. Edwards related that "it [was] . . . an accepted principle that you don't get out of a gang." Edwards testified that he had received threats for testifying against the appellant.

James Greg Cook testified that at approximately 2:45 a.m. on February 10, 2002, the appellant came to his house and asked him for a ride home. During the drive, the appellant told Cook to drive to Robinson Street. Cook related that the victim lived on Robinson Street. Cook observed Edwards and the victim walking along Robinson Street. The appellant asked Cook to let him out of the vehicle, and Cook complied. Cook testified that "as [the appellant] was getting out

I heard a shot. Well, what I thought was a shot, and then I seen him run across the grass, run up to [the victim]." Cook then observed Edwards running away. Cook heard another shot and observed the victim grab his side and fall to the ground. The appellant ran away.

After the shooting, Cook went into hiding in Missouri. He was subsequently arrested in Humboldt, Tennessee, after being stopped for traffic violations. At trial, Cook conceded that his testimony was different from the statement he gave to Hartsfield, in which statement he claimed that he was not with the appellant that morning and was not involved in the shooting. He further conceded that neither Edwards nor the victim had a weapon. Cook testified that he and the victim had been members of a gang in Milan; however, he was unable to recall whether the appellant had been a gang member. According to Cook, members could "get out" of the gang, though "some . . . members frown on it." Cook acknowledged that on the night of the shooting he was driving his girlfriend's green Grand Prix. Cook testified that the appellant shot the victim, but he denied shooting at Edwards.

Terry Lee testified that he had known the appellant for approximately five years and had been confined with the appellant at the Gibson County Jail following the shooting. According to Lee, while in confinement, the appellant discussed the details of the shooting. The appellant told Lee that he and the victim had argued at The Post because the victim attempted to enter the nightclub without paying. When the victim left, the appellant followed him to the parking lot, and they argued. After leaving the nightclub, the appellant went to Greg Cook's house, and Cook drove him to the intersection at Robinson Street and Ellis. Cook stopped the vehicle near the victim and Edwards, who were standing at the intersection. The appellant jumped out of the vehicle and started shooting. The appellant told Lee that he and Cook attempted to stop Edwards as he fled, but they were unsuccessful. The appellant and Cook then fled the scene.

Lee testified that the appellant and the victim were members of the Gangster Disciples. The appellant told Lee that the victim wanted out of the gang. Lee claimed that the appellant subsequently learned that he had spoken to investigators about the shooting. In a letter dated May 9, 2003, Lee asked the district attorney to transfer or release him from the Gibson County Jail because the appellant was a leader in a gang and the jail was "full of gang members." Lee said that he feared for his life. Lee was transferred to the Madison County Jail.

Dr. Cynthia Gardner testified that in February 2002 she was an assistant medical examiner for Shelby County and performed the victim's autopsy. Dr. Gardner testified that the cause of the victim's death was a gunshot wound to the chest. According to Dr. Gardner, the victim was more than two feet away from the pistol when shot. Dr. Gardner related that the bullet traveled straight through the victim's body. She further related that no drugs were detected in the victim's system, but the victim had a blood alcohol content of .095 percent.

Tammy Peete testified on behalf of the appellant at trial. She related that on February 10, 2002, she was at home with her three children. At approximately 2:15 a.m., the appellant telephoned and asked her to pick him up at The Post. When she arrived, the appellant was outside with Edwards

and the victim. They appeared to be talking, but Tammy soon realized they were arguing. Tammy sent someone into the nightclub to tell her brothers to come outside. Thereafter, her brothers came outside and told the appellant "wasn't nobody fixing to fight." At that time, a police officer drove up and told them to leave. Edwards and the victim walked away. The appellant got into Tammy's white Chrysler New Yorker, and they left.

Tammy and the appellant drove to a nearby Huddle House, but the restaurant was too crowded. They then returned to the nightclub to check on her brothers. When they did not see them, they drove home. Tammy testified that when they arrived home, the appellant went inside and went to sleep. Shortly thereafter, her brothers arrived at her house to ask the appellant to go to Huddle House. However, they were unable to wake the appellant and they left. According to Tammy, the appellant did not wake until 8:30 a.m.

Later that morning, Tammy's sister Sabrina came to the house and informed Tammy that the victim had been shot. She subsequently told Tammy that the appellant was being accused of the crime. Upon learning that he was a suspect in the shooting, the appellant left without telling Tammy where he was going. Tammy testified that the night of the shooting, Chief Nolan came to her house looking for the appellant. Tammy told him that she did not know where the appellant was, but he had been at home at the time of the shooting. Tammy testified that she did not speak to the appellant until he turned himself in the next day. On cross-examination, Tammy denied being at the scene of the shooting. She further denied that on the night of the shooting Hartsfield came to her house and banged on the door.

Tammy's brothers, James and Jeremiah Peete, also testified on behalf of the appellant. James testified that on the night of the shooting he left The Post at approximately 3:00 a.m. The appellant had left the nightclub earlier with Tammy. James recalled that before the appellant left, there was a "little commotion" in the parking lot. James went outside and observed Edwards hitting the rear of Tammy's vehicle, saying, "Let 'em fight. Let 'em fight." However, he did not observe anyone fighting. Thereafter, the appellant got into Tammy's vehicle, and he and Tammy drove away. James returned to the nightclub.

James testified that he subsequently left the nightclub with his brother and two female friends. They decided to go to Tammy's house, but as they turned onto Robinson Street, they observed Sergeant Davis's patrol vehicle with its lights activated. Sergeant Davis stopped the vehicle and said, "Ya'll can't come over here." According to James, his brother walked to the scene and observed the victim's body laying in the street. Thereafter, they drove to Tammy's house. When they arrived at Tammy's house, the appellant was asleep in bed. James and Jeremiah were unable to wake the appellant and they left. On cross-examination, James acknowledged that when he arrived at his sister's house, he did not tell her about the murder. He also conceded that he did not know if the appellant shot the victim.

Jeremiah testified that he left the nightclub about the time it closed. As he left, he observed Sergeant Davis driving through the parking lot. Jeremiah denied seeing anyone fighting or arguing.

-5-

He also testified that he did not hear Edwards saying, "Let 'em fight." Jeremiah observed the appellant get into Tammy's vehicle and leave. The victim walked away with Edwards. Jeremiah testified that he and James subsequently left the nightclub with two female friends and went to Huddle House. Thereafter, they went to Tammy's house. However, because the appellant was in bed asleep, they left. Upon leaving Tammy's house, they observed "a lot of police and stuff in the road." Sergeant Davis approached the vehicle and told them to "[g]o back." Jeremiah asked Sergeant Davis what had happened, and she informed him that the victim had been shot.

At trial, the appellant testified that on February 10, 2002, he worked the door at The Post. He related that the victim and Edwards became angry when he told them they had to pay a one dollar fee to reenter the nightclub. At approximately 2:00 a.m., the appellant telephoned Tammy to pick him up, and he went to the parking lot to wait. According to the appellant, "that's when it all started." Edwards was "mouthing," and the victim was standing nearby. About that time, Tammy arrived, and the appellant got into her vehicle. When Sergeant Davis arrived shortly thereafter, Edwards and the victim walked away. Sergeant Davis asked if there was a problem, and the appellant told her no. The appellant and Tammy left and drove to Huddle House; however, Huddle House was crowded. They returned to the nightclub to check on Tammy's brothers and then went home.

The appellant testified that upon arriving home, he immediately went to bed. The appellant was unable to recall Tammy's brothers coming to the house. He was also unable to recall Hartsfield banging on the door. He claimed that he slept until after 8:00 a.m. that morning when Tammy's sister and another friend informed him that the victim had been shot and he was a suspect. The appellant testified that he went to Jackson and stayed in a hotel until the next day when he surrendered at the Gibson County Jail. The appellant denied possessing a weapon or shooting the victim. Although he acknowledged sharing a cell with Terry Lee at the Gibson County Jail, he denied telling Lee that he shot the victim. He further denied being a leader of the Gangster Disciples or shooting the victim for attempting to "get out of [the] gang."

In rebuttal, the State presented the testimony of Officer Kenneth Jones, Officer Jason Krause, and Sergeant Davis. Significantly, Officer Krause testified that although he was unable to recall seeing Tammy at the crime scene, he did observe her white Chrysler New Yorker. Sergeant Davis testified that she was certain she had seen Tammy at the crime scene.

Based upon the testimony at trial, the jury convicted the appellant of first degree murder, and the appellant was sentenced to life imprisonment. The appellant now brings this appeal, arguing that the evidence was insufficient to support his conviction of first degree premeditated murder.

## II. Analysis

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Should the reviewing court find particular conflicts in the trial testimony, the court must resolve the conflicts in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. This court will not reweigh or reevaluate the evidence. Bland, 958 S.W.2d at 659.

First degree murder is defined in pertinent part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

On appeal, the appellant first contends that his conviction was "based entirely upon the conflicting eyewitness testimony of two convicted felons." However, as noted, conflicts in the trial testimony must be resolved in favor of the jury verdict. Tuggle, 639 S.W.2d at 914. Moreover, questions concerning the credibility of the witnesses and the weight to be afforded their testimony are to be resolved by the trier of fact. Bland, 958 S.W.2d at 659. This court will not reweigh or reevaluate the evidence. Id.

Next, the appellant asserts that there was no evidence of premeditation. We note that the element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, the procurement of a weapon, the use of a deadly weapon

upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the State, the evidence establishes that in the early morning hours of February 10, 2002, the appellant and the victim were seen arguing in the parking lot of a local nightclub. However, they left when Sergeant Davis appeared on the scene. The victim walked home from the nightclub with Tyrone Edwards, and the appellant drove away with his girlfriend. Thereafter, the appellant asked Greg Cook to drive him to Robinson Street, the street on which the victim lived. As they approached Robinson Street, they observed the victim and Edwards at the intersection of Robinson Street and Ellis. Cook stopped his vehicle near the intersection, and the appellant jumped out of the vehicle with a pistol. The appellant shot once over the victim's head. The victim then rushed the appellant, and the appellant shot the victim, striking him in the chest. The victim fell to the ground, and the appellant and Cook fled the scene. The appellant fled on foot, and a driver summoned for help observed the green Grand Prix driven by Cook "backing . . . down" Robinson Street. There was no evidence that the victim was armed with a weapon. Moreover, testimony suggested that the shooting may have been gang-related and that the appellant shot the victim because he was trying to "get out of" the Gangster Disciples. We conclude that a rational jury could have found that the appellant acted with premeditation. Thus, the evidence supports the appellant's conviction of first degree premeditated murder.

### III. Conclusion

Accordingly, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-8-