# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 6, 2007

## STATE OF TENNESSEE v. LEAH JOY WARD

**Direct Appeal from the Criminal Court for Shelby County**
No. 03-04434     James C. Beasley, Jr., Judge

---

**No. W2005-02802-CCA-R3-CD  - Filed May 30, 2007**

---

The defendant, Leah Joy Ward, was found guilty by a jury of first degree premeditated murder. She was sentenced to life imprisonment. The only issue presented on appeal is whether the evidence supports the element of premeditation. After review, we conclude the evidence was sufficient and affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Robert Wilson Jones, District Public Defender; Tony N. Brayton (on appeal), Mary Kathryn Kent and Harry E. Sayle, III (at trial), Assistant District Public Defenders, for the appellant, Leah Joy Ward.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience R. Branham and Pamela Fleming, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case concerns the death of Ejaz Ahmad at the hands of his wife, the defendant. The victim was a Pakistani immigrant who had married the defendant approximately six months before his death after a brief acquaintanceship. The defendant admitted shooting the victim but claimed that she acted in self-defense.

Kafait Malik, a pharmacology professor, had known the victim approximately fifteen years since first meeting him in a Memphis mosque. Malik performed a Muslim wedding ceremony when the victim and defendant were married. Not long after the wedding, the victim complained to Malik that the defendant was keeping him from tending to his business. The victim had learned that the defendant was on probation and was in violation of the terms of her probation. Malik described her

behavior as paradoxical. She was obsessed with the victim but would disappear without explanation and would exhibit other strange behavior. He stated that the victim was extremely kind.

Naseer Meer lived with the victim, at the victim's residence, for four years until Meer's family came from Pakistan. Meer attended the victim's and defendant's Muslim wedding on October 5, 2002. Meer had no knowledge of the defendant prior to the night of the wedding. Meer said he had never seen the victim act violently or display anger.

Johnny Smith, Jr. had known the victim for fourteen or fifteen years and had stayed at the victim's house on an irregular basis. The victim had allowed the defendant to move into his house due to her being homeless. The victim stayed with friends for a few weeks before the marriage and then moved back into his home with the defendant. Smith described the defendant as very jealous and demanding toward the victim. The victim had a son, Tarik, by a former marriage. Tarik often spent weekends with the victim. Smith was present on one occasion when Tarik's mother called to check on him, and the defendant became very angry and attempted to take the phone. The defendant acted as if she were leaving, and the victim followed her outside. The victim came back immediately with a mark under his eye and said the defendant had hit him. Smith went outside to talk with the defendant. The defendant was still angry and stated that she could kill the victim. Smith did not take the statement seriously at that time.

On two occasions, the victim complained to Smith of the defendant withdrawing money from the victim's account. The second occasion was only a month after the wedding. In both conversations, the victim asked Smith if the victim should tell the defendant to leave. Smith attempted to call the victim the latter part of April 2003. The defendant answered, told Smith that the victim had gone to Pakistan, and hung up the phone.

Lori Peeper had been married to the victim twice. She obtained both divorces, the first on grounds of cruel and inhuman treatment and the second for desertion. However, she said the victim was never violent or abusive and had never hurt her. The victim was also a good father to their son, Tarik, and was very protective of him. The victim frequently talked and visited with Tarik. In April 2003, Peeper and Tarik lost contact with the victim. The defendant told her that he had gone to Pakistan. She went to the victim's home and knocked without receiving a response. She made inquiries at a mosque and was told that the victim had not been seen there for two weeks. She attempted but was not allowed to file a missing person report.

Ernestine Marsh, the mother of Lori Peeper, described the victim as a good father to her grandson, Tarik. She never knew the victim to be violent toward her daughter. During a period in April 2003, the victim had not called Tarik and calls to the victim were unanswered. Mrs. Marsh overheard the defendant tell Tarik on one occasion that the victim was in West Memphis. In a later conversation, the defendant claimed he had gone to Pakistan. This caused Mrs. Marsh to become more concerned. On May 1, she took Tarik to the victim's residence. They were able to see through the windows that the furniture and other belongings were gone. They noticed a foul odor present on the premises. Tarik removed boards that were blocking an entrance to a shed in the backyard. There

they discovered the victim's body covered by a foam eggcrate mattress. Mrs. Marsh immediately called 9-1-1 from a neighbor's residence.

Tarik Ahmad was fourteen at the time of trial. He testified to the close relationship he shared with his father, the victim. Tarik was with his father on most weekends, and they talked frequently during the week. Tarik estimated that the defendant lived with his father about six months. He witnessed some arguments between the victim and the defendant, but he never saw the victim be physical toward the defendant. On one occasion, when the defendant returned home at approximately 3:00 a.m., the victim shouted at her and the defendant beat the victim on the chest. He stated that the victim owned a lot of jewelry. The victim also kept "lots" of money in various hiding places in the house. Tarik recovered none of the victim's possessions, except for a bedroom suite that was reclaimed at a storage facility.

In April of 2003, Tarik had not heard from the victim for about three weeks. On May 1, Tarik and his grandmother, Mrs. Marsh, went to the victim's house. Tarik removed large boards that were covering the entrance to a shed in the rear of the premises. Within the shed, they found the victim's body covered by a foam eggcrate mattress.

Tarsha Lilly lived across the street from the victim. She stated that, in April 2003, the defendant approached her concerning selling the furniture in the victim's house. The defendant said that her husband was out of town. Later, Ms. Lilly observed a rental truck at the victim's residence. The victim's body was discovered two to three weeks after the defendant had proposed selling the furniture.

Deborah Moore, another neighbor, testified that a "moving panel truck" was at the victim's residence for about a week. Ms. Moore had not seen the victim as usual during a period in April 2003.

Walid Salam, a used car dealer, had known the victim since 2002. He also knew the defendant. He described seeing the defendant on two occasions when she appeared angry. On the first occasion, Salam, his female employee, and the victim were at a restaurant when the defendant came in. The defendant took the victim aside, and they talked. Later, the victim told Salam that the defendant was very jealous and was causing him problems. On the second occasion, the defendant showed up at a thrift store where Salam and the victim were. The defendant appeared angry at that time as well.

On a later date, the defendant came to Salam's business. He described the defendant as "very, very sweaty and very hyperactive and shaking extremely . . ." She told Salam that the victim had gone to Pakistan and had left her no money. Salam paid the defendant $300 for the car she was driving. The next day, at the defendant's request, Salam took a mechanic to the victim's residence to repair a Lincoln automobile. The defendant then asked the men for help in moving some boxes. Salam noticed an odor that the defendant explained as bad food in the refrigerator. The victim wanted to sell other cars at the residence. Salam described them as salvage vehicles but moved them

to his lot. He produced copies of bills of sale dated April 28, 2003, showing that he paid a total of $675 for five cars. Salam observed no marks or bruises on the defendant. Salam heard of the victim's death shortly after these events and notified police.

In late April 2003, the defendant pawned a ring, which was later identified as belonging to the victim. The defendant signed a document stating that the ring was hers and received $40 in exchange.

On April 28, the defendant rented a moving truck and storage space from Storage USA. She rented the 10' x 15' space for six months and paid $400 in cash for the rental term. A man and woman were with the defendant while she was unloading the belongings.

Mary Rogers, the defendant's mother, had accompanied the defendant to a probation violation hearing in the federal court in Jackson, Tennessee. The victim also went along but remained in the car during the hearing. The defendant was sentenced to six months of incarceration but was given until May 1, 2003, to report. Mrs. Rogers received a call from the defendant on May 2. The defendant told her that the victim was dead and that she, the defendant, was a suspect.

Members of the Memphis Police Department responded to the victim's residence on May 1. The area was secured, and crime scene investigators began processing the scene for evidence. Inside the residence, officers took samples of suspected blood stains in different locations. Later testing of these did not indicate the presence of blood.

Officer James Fitzpatrick, a Memphis Police Department homicide investigator, was the crime scene coordinator. He observed that the partially decomposed body's head had been severed and was missing. Some swords were found in the residence. Investigators found no evidence of forced entry on interior or exterior doors of the residence. Officer Fitzpatrick said the odor in the house, especially in one bedroom and in a bathroom, was very bad. The victim was later identified by means of a thumb print. Dr. O. C. Smith, the Shelby County Medical Examiner, was called to the scene.

Dr. O. C. Smith was accepted as an expert in forensic pathology. He observed the crime scene on May 1. He noted that there was skin tissue from the victim's hand on the concrete pad of the shed where the victim's body was found. This tissue was used to obtain a finger print and to ultimately identify the victim. Dr. Smith noted that a wire cable was wrapped around one leg of the victim and a red rope was wrapped around one arm. From the state of the victim's decomposition, Dr. Smith estimated that the victim had been dead for two to three weeks. Due to the light level of insect activity present, he opined that the body had been outside for a relatively short period.

Dr. Teresa Campbell, a forensic pathologist, performed an autopsy on the victim. She determined the cause of death to be a gunshot wound to the chest. An x-ray revealed a bullet over the spine in the abdominal area. Despite the decomposition, she was able to discern a track from the point of entry to the bullet. There were knife wounds on the victim's body, which were inconclusive

as to being made before death. Dr. Campbell also opined that the body had been in a protected area before it was removed to the scene where it was found.

Dr. Jennifer Love, a forensic anthropologist, testified concerning her findings from the examination of the victim's bones. She stated that the markings on the cervical vertebrae indicated a cut with a straight-edged type of knife. Her examination of the head and neck of the left femur indicated there had been an attempt to cut off the left leg. The victim's forearm had marks consistent with rodent activity.

After the defendant was located in federal custody, she was questioned by two Memphis Police Department homicide detectives. The defendant gave a voluntary statement on May 5. The defendant stated she had shot the victim at least three weeks earlier. In her statement, the defendant said that the it was "at least two-thirty in the evening" when the shooting took place. On the day prior to the shooting, she had taken the victim's bag concerning his papers. She said the victim was mad prior to this, and she took the bag so he would be forced to talk with her. She went to a friend's residence after her work shift that night and then returned home at about midnight or 1:00 a.m. The victim asked her about the bag, and she denied any knowledge of its location. The victim said he would kill her if she touched the bag again. The defendant had kept a gun on a top shelf of her daughter's bedroom. She took the gun into the bedroom and put it under her bed.

The defendant stated that "around six or seven," the victim, speaking through the locked bedroom door, asked her if she was going to school. She said the victim then "busted the door," started beating the defendant, and asked her where the gun was. The defendant said she did not know if the victim "busted the door" the first or second time but he tried to enter the room through a window. She hid in the bathroom closet with the bathroom door locked. The victim sprayed water into the bathroom with a hose from outside. The defendant said she ran to the bedroom and got the gun. The victim came through the door and grabbed her by the throat. The defendant pulled the trigger once, and the gun did not fire. The defendant said, "Then I pulled the trigger again. The gun went off. Okay. And I pulled the trigger again. The gun went off." She stated the bullets hit the victim in the heart and in the stomach. The victim fell on the bed, then to the floor. The defendant went to the living room and prayed for the victim. When she returned to the bedroom, he was dead.

The defendant said she did not know where she disposed of the gun. Later, she unsuccessfully attempted to put the victim's body in the bathtub. After "weeks," the odor was strong and she saw worms coming from the victim's head. She stated that she panicked and cut the victim's head off with a sword. She disposed of the head in a dumpster. Eventually, she drug the body out to the shed and covered it with a "foam thing." She estimated the body was outside for two or three days before it was discovered.

The defendant denied trying to gain from disposing of the victim's property. She sold a couple of cars for fifty dollars. She "gave away almost everything" and placed some items in storage. She pawned only one ring. The defendant said she did not notify police because she was

on probation, a gun was present in the house, and she was scared. She concluded by saying she had not intended to kill the victim but was only protecting herself.

After the State rested, the defense presented one witness, Marc Caudel, an investigator for the Public Defender's Office. Mr. Caudel related that Walid Salam had informed him that the victim had a temper and that he had seen the victim be aggressive on occasions.

Based on the above evidence, the jury returned a guilty verdict of first degree premeditated murder.

## Sufficiency of the Evidence

The sole issue presented for our review is whether the evidence was sufficient to support the defendant's conviction for first degree premeditated murder. The defendant contends that the evidence supporting premeditation was insufficient. The State argues that both direct and circumstantial evidence of premeditation were sufficiently established to support the jury's verdict.

Our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004). During review of the evidence, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000). Any questions concerning the credibility of witnesses, the weight and value of the evidence, or other factual issues raised by the evidence are resolved by the fact finder and are not re-weighed or re-evaluated by this court. State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003).

The statutory definition of first degree premeditated murder is "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The issue as to the presence of premeditation in a given case is a question of fact for the jury to determine from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Because the element of premeditation involves the defendant's state of mind, a factor which is not always shown by direct evidence, circumstantial evidence may be used to prove premeditation. Id. at 614-15.

Our supreme court has provided a list of non-exclusive circumstances that would justify a jury in finding or inferring premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill the victim; the defendant's procurement of a weapon; preparations taken to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and the defendant's calm demeanor immediately after the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998). These factors are demonstrative that premeditation may be established by any evidence from which a rational trier of fact could infer that the killing occurred after the exercise of reflection and judgment. Davidson, 121 S.W.3d at 615. In addition, evidence which establishes a motive by the defendant will warrant an inference of premeditation. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support a finding of premeditation. The defendant's claim of killing in self-defense was rejected by the jury, a prerogative within the jury's province. There was evidence by a witness who had heard the defendant state that she could kill the victim. Although the witness placed little importance on the assertion at the time, it assumed a more sinister tone in light of subsequent events. The witness did not provide a date for this event; however, the defendant and victim were together for only a six-month period.

On the day before the killing, the defendant took the victim's bag containing his personal papers. The defendant was aware that this would provoke the victim. The defendant then procured a handgun, which she had secreted in the residence, and placed it under her bed. She admittedly shot the unarmed victim with this gun and claimed self-defense. Despite the defendant's claims that the victim "busted the door" to her bedroom, investigators found no evidence of forced entry on the exterior or interior doors of the residence.

Her subsequent actions consisted of a systematic effort to dispose of the victim's belongings by selling, pawning, or placing them in storage for her later retrieval. The defendant deflected all inquiries concerning the victim's whereabouts with knowing falsehoods. The defendant disposed of the weapon, and it was never located. She further attempted to dismember the body and was successful in severing the head, which she deposited in a dumpster. Standing alone, the concealment of evidence of a crime is insufficient to prove premeditation. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992) ("The concealment of evidence . . . may be associated with the commission of any crime and the accompanying fear of punishment.")

In the instant case, the prosecution was not limited to the defendant's efforts at concealment of the evidence to prove premeditation. Other circumstances existed from which one could infer premeditation: the defendant's homicidal statement and the procurement and use of a deadly weapon on an unarmed victim. Additionally, the jury would have been warranted in finding the defendant was motivated by personal gain. No accounting was ever made of the money stored in the residence by the victim. Some sales of the victim's personal goods were documented, although all were not fully accounted for.

Conclusion

For the foregoing reasons, we conclude that the evidence sufficiently supported the finding that the defendant committed a premeditated first degree murder. We therefore affirm the conviction and order of judgment.

_____
JOHN EVERETT WILLIAMS, JUDGE