IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2008 Session

**STATE OF TENNESSEE v. JAMIEL D. WILLIAMS**

**Appeal from the Circuit Court for Williamson County**
**No. CR08129     Timothy L. Easter, Judge**

---

**No. M2007-01666-CCA-R3-CD - Filed May 27, 2008**

---

The defendant, Jamiel D. Williams, appeals his Williamson County Circuit Court conviction of first degree murder, alleging that there was insufficient evidence to prove premeditation. We hold that the evidence presented at trial was sufficient and affirm the judgment of the trial court. The judgment is modified because it incorrectly classifies the sentence as a Class A felony.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Robert H. Hassell and Gene Honea, Franklin Tennessee, for the appellant, Jamiel D. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; and Derek K. Smith, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

On August 8, 2005, the Williamson County Grand Jury indicted the defendant on one charge of first degree premeditated murder. *See* T.C.A. § 39-13-202 (2003). A jury convicted the defendant of the charge on August 17, 2006, and on October 24, 2006, the trial court sentenced the defendant to life in prison to be served in the Department of Correction.

In light of the fact that the sole issue we address here is the sufficiency of the evidence of premeditation, an element of first degree murder in this case, we summarize only the pertinent testimony from the trial.

John Paul Taylor, a detective with the Franklin Police Department, testified that on April 26, 2005, he was the on-call detective for the evening. Detective Taylor received a telephone call at 11:00 p.m. that someone had been shot on 9th Avenue and that the individual was being taken to the hospital. The individual was later identified as Aaron Jones. Detective Taylor went to the

police station, picked up the "crime scene van," and went to the scene of the shooting. Several police officers were already on the scene and had closed the street. Shortly after arriving on the scene, Detective Taylor received a phone call informing him that the shooting victim had died. Detective Taylor testified that there were no witnesses at the scene.

Detective Taylor testified he was able to ascertain where the shooting occurred by the "large pool of blood" behind 114 9th Avenue and "blood splatter" in the driveway leading to the rear of the house. Additionally, five shell casings were found at that location and sent to the Tennessee Bureau of Investigation (TBI) crime lab for analysis. No gun was recovered from the scene. Detective Taylor testified that the blood trail gave the indication that after being shot the victim traveled about 25 to 30 feet to the back of the house before collapsing. He testified that the police retrieved samples of the blood from different areas, took photos, collected castings of footprints in the area near the shell casings, and interviewed neighbors.

Detective Taylor testified that the police received tips that led them to recover a gun at 1107 Incinerator Road, an address five to ten miles from the crime scene. Their information was that Tonya Thomas had acquired the gun. Ms. Thomas told police

> [T]he night of the shooting, she was at . . . Lottie Hardin's[1] [] home on Reddick Street when she heard a knock on the back door. And Cory Esmon showed up and he had the weapon with him. He then handed the weapon off to an individual by the name of Derrick McLemore . . . . [Derrick said to Cory] he didn't need to have that weapon . . . . Later that night Derrick was driving around with Tonya and . . . told her that she needed to hide the gun at her residence. He drove her to that location and she then exited the vehicle and hid the weapon in the back yard by a fence.

The recovered gun was photographed and sent to the TBI lab for analysis, where it was identified as a "High Point" .45 semi-automatic handgun. Detective Taylor testified that the TBI report showed that two bullets removed from victim's body were fired by this gun.

Detective Taylor testified that after interviewing many suspects the police apprehended the defendant at his grandmother's house within 48 hours of the shooting and that the defendant had "no demeanor; he basically just sat there" when taken into custody.

Detective Taylor attended the autopsy of the victim, noting that the victim sustained a gunshot wound to the face and two wounds to his chest.

Shavalia Radley testified that she was the victim's girlfriend and had been dating him for about one year. On April 26, 2005, Ms. Radley got off work at a Krystal restaurant at

---

[1]Ms. Hardin is alternately referred to in the record as "Lottie Hardiman."

-2-

approximately 8:00 p.m., and she and the victim walked to her grandmother's house. They were planning to go to Reddick Court where their friend Demetria Jones lived. While on their way, they ran into a group of people including Jamal Pope, Cory Esmon, Paris "I don't know her last name," and the defendant. Ms. Radley testified that "Cory approached [the victim] and wanted to shake his hand, but [the victim] wouldn't shake his hand." This led to an argument with cursing and loud shouting, but no physical altercation occurred despite Mr. Esmon's grabbing a stick and the victim's having a knife.

The shooting apparently occurred a short time later, when the victim returned to confront Mr. Esmon. Ricky Brice testified that he witnessed the shooting of the victim. He was outside and saw the victim engaged in a fight with Cory Esmon in front of Trent Covington's house while the defendant remained on Mr. Covington's porch . He testified that "[the victim] whooped Cory. In the process of [the victim's] whooping Cory, he had him down [on the ground] and he whooped him." He testified that Cory told the victim "yeah man, you won," and after the victim backed away, the defendant stepped off the porch and shot him. Mr. Brice testified that "the gun fired five times. And from the look of the strikes that the motions that [the victim] went through, I believe it hit him three times."

Trent Covington testified that he lived at 144 9th Avenue South and that on the evening of April 26, 2005, "[s]omebody got shot in my driveway." He testified that at the time of the fight, "[h]alf of us was on the porch, half was in the yard" and that "[f]rom my understanding it was over a female." He testified that the victim was winning the fight before it was stopped.

Doctor Feng Li, an assistant medical examiner for Davidson and Williamson counties, testified that an autopsy was performed on the victim's body on April 27, 2005. Doctor Li testified that the victim suffered one gunshot wound to the face, one to the left side of the chest, a third to the right side of the chest, and gunshot grazing wounds on his right upper arm and left wrist. There was no evidence of "stippling" around the gunshot wounds, which indicated the shooter was more than two and one-half feet to three feet from the victim when he fired the shots. Doctor Li testified he was unable to determine the order of the gunshots or whether the shooter stood above the victim.

Corzell "Cory" Esmon testified that on April 26, 2005, he was hanging out with the defendant, Jamal Pope, and a man named Jarvis. They spent the day walking around town, driving around, and drinking alcohol. Mr. Esmon testified that he first met the victim on that day and that the afternoon altercation was the result of an argument started by the victim over his girlfriend. Mr. Esmon noticed the victim had his hands in his pants so he asked him why. He testified that the victim became defensive and said "something about I stab you – he said, You talking to my girl, I stab you." Mr. Esmon testified that he could not have been talking to the victim's girlfriend because he was there with another woman. He picked up a stick to defend himself from the victim, and the two of them were separated. Mr. Esmon and his group then left the scene and went to Trent Covington's house.

Mr. Esmon testified that at Mr. Covington's house he was told that the victim wanted to fight him one-on-one. He accepted the challenge and kept drinking until the victim arrived. When the victim arrived Mr. Esmon told him he was too drunk to fight him at that time. After continued provocation, Mr. Esmon took his shirt off, took a swing, missed, and fell down. Mr. Esmon testified that the victim then "fell on top of me and started pounding me in my face; just pound me, pound me." Mr. Esmon testified that he conceded defeat in the fight and that when he was getting up, the shooting occurred. He saw the defendant shoot the victim after the defendant jumped off the porch. He testified he did not see the victim get hit, but he saw the shots fired and heard "[a]t least five – five to six shots." He did see the victim run behind the house after the shooting. Mr. Esmon testified he retrieved the gun from the defendant and ran away with the intent to dispose of the weapon. He went to Lottie Hardin's home, where he smoked crack cocaine and gave the gun to Derrick McLemore.

On cross examination, Mr. Esmon admitted to removing the magazine from the gun but denied removing any bullets. He testified that no bullets remained in the gun.

Antonio Brown testified that he was a member of the "Bloods" gang and was currently incarcerated for a parole violation from a drug charge. On the afternoon of the shooting, Mr. Brown was driving around the city and happened to drive by Mr. Esmon and the victim during their first altercation of the day. He knew the victim's girlfriend, Ms. Radley, because he knew her family. He testified that he asked Ms. Radley what was going on, and the victim responded that Mr. Esmons' group was trying to jump him. Mr. Brown got out of his car to talk to the people still at the scene. The victim departed, and Mr. Esmon told Mr. Brown that the victim pulled a knife on him. He testified that the defendant then stated, "I'm going to get my folks – you know what I'm saying, we ain't got time to be talking about that. I'm going to get my folks and we're going to have this out."

Mr. Brown testified that he got back in his car and drove down the street, found the victim and Ms. Radley, and asked them about the incident. The victim reported that "Cory supposedly disrespected him or something. . . . Cory said a smart remark to him; something like they're going to make me kill him, or something to that nature, you know."

Mr. Brown testified that later that day he saw the victim walking to Trent Covington's. He picked the victim up and drove him there with the intention of straightening things out. He testified, "You had Cory's story, then you had [the victim's] story, so we were just trying to . . . let both of them talk [to] . . . find out who be telling the truth, who would be lying." Mr. Brown determined that Cory was lying and "that he had been knowing this girl, or something, longer than him." He testified that everyone agreed that Mr. Esmon and the victim would fight. Mr. Esmon had a gun and he gave it to the defendant before the fight began. They started the fight, and the victim started "whooping" Mr. Esmon. He testified that after Mr. Esmon admitted defeat, "[the victim] was getting ready to get up. . . . [and the defendant] jumped off the porch, man, and just started shooting."

-4-

The defendant chose not to testify.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2003). "'[P]remeditation' is an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d).

Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *See State v. Johnny Wright*, No. 01C01-9503-CC-00093, slip op. at 9 (Tenn. Crim. App., Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court looks to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

Under these circumstances, it is our view that the evidence was sufficient to support the conviction of premeditated first degree murder. After the confrontation between the victim and Mr. Esmon, the defendant made the statement, "I'm going to get my folks; we're going to have this out." A jury may infer premeditation from a defendant's prior threats. *See State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). The defendant procured the gun from another individual, Mr. Esmon. He used that gun to shoot the victim multiple times. *See State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000) (holding that infliction of multiple wounds on a victim may be indicative of premeditation). The defendant fled the scene and left the gun with Mr. Esmon, who later concealed

the evidence. There was ample evidence to support the conviction for premeditated first degree murder.

Accordingly, we affirm the judgment of the trial court. However, the judgment incorrectly classifies the offense as a Class A felony. The trial court shall amend the judgment to reflect that the offense is classified as first degree murder, an offense that occupies a separate conviction class.

_____
JAMES CURWOOD WITT, JR., JUDGE