# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 5, 2009

## STATE OF TENNESSEE v. ANDREW DEON HARVILLE

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5765     Joseph H. Walker, III, Judge**

---

**No. W2008-02375-CCA-R3-CD  - Filed February 19, 2010**

---

The Defendant-Appellant, Andrew Deon Harville, was convicted by a Tipton County jury of first degree premeditated murder and evading arrest in a motor vehicle, a Class E felony. He received a life sentence as a violent offender for first degree murder, and he was sentenced as a standard offender to two years for evading arrest. The trial court ordered that the two-year sentence be served consecutive to the life sentence. On appeal, Harville claims his conviction for first degree murder was not supported by sufficient evidence of premeditation. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and J. C. MCLIN, JJ., joined.

Gary F. Antrican, District Public Defender; David S. Stockton and Jeff Lee, Assistant Public Defenders, Covington, Tennessee, for the Defendant-Appellant, Andrew Deon Harville.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; Mike D. District Attorney General; James Walter Freeland, Jr., and P. Neal Oldham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial**. This conviction arose from the shooting death of Kelvin Rodgers, the victim, at a nightclub called The Farm. The victim was employed as a bouncer with The Farm. Harville was arrested shortly after the shooting, and he gave the following sworn statement to Investigator David Harmon of the Tennessee Bureau of Investigation (TBI):

I, Andrew Harville, swear the following statement to be true, on September 15, 2007, at the Tipton County Sheriff's Department in Covington, Tennessee.

September 15, 2007, around two to three a.m. in the morning, I was at The Farm bar in Covington, Tennessee. While I was at the bar I had an altercation with one of the security guards. I arrived at the bar around ten to ten-thirty p.m. on September 14, 2007. I paid a dollar to get into the bar, and the altercation occurred around two to three a.m. on September 15, 2007.

I was standing up next to a girl sitting on a stool. One of the bouncers grabbed me by the shirt and said, "You need to leave." He then started pushing me out the door of the bar. I tried to talk to the guys working at the front of the bar, but they would not listen. He kept telling me, "You need to leave," and then he sprayed me with mace in the eyes. He then kicked me in the butt on the way out the door. He told me again that I needed to leave and showed me a revolver that was in his waistline.

I then told him that, "I'm leaving."

I then went to my car, a 1989 Pontiac Sunbird, and sat in it to get my eyes right. It took around seven to eight minutes to get my eyes back after being maced. I then decided that I'm going to get that motherfucker.

The security guard then came outside to his truck. I had a twelve-gauge shotgun, loaded, in the front seat, with buckshot. When the security guard came out, I pulled my car toward him. I then rolled down my window and shot him two or three times. I just shot toward him. I didn't aim. I just shot. After I shot the security guard, I didn't even know if I hit him or not.

I then headed back toward Covington on Highway 51. Covington Police Department, Officer Oates, stopped me. Before Officer Oates stopped me I threw the shotgun out of the window by the Intercraft factory. I told Officer Oates that the shells were in the car. Officer Oates then took me into custody.

I've made this statement freely with[1] promise of anything.

Signed, Andrew Harville 9/15/2007.

_____

[1] Investigator David Harmon testified that the statement should state "without" instead of "with."

The State's first witness was Jonathan French who spent time with Harville before he went to The Farm. French testified that he and Harville were "hanging out" at a friend's house around sunset. French described Harville as "[l]aid back at the time." At some point, Harville left the house because he needed to go home and shower. French said Harville returned roughly an hour later between 9:00 and 10:00 p.m. and appeared "a little upset." Harville claimed "he beat the shit out of somebody." French remained at his friend's house for another two or three hours during which Harville drank beer and gin straight from a bottle. French recalled leaving his friend's house at around 11:30 p.m. to go to The Farm. He said Harville also went to The Farm, but rode in a separate vehicle. At the club, French described Harville as "[l]aid back, just observant." He did not recall seeing Harville drink alcohol there, and he did not see Harville being ejected from the club.

Cary Ray Davis testified that he was working as a bouncer alongside the victim on the night of the shooting. A woman approached him and Rodgers and said Harville was disturbing her and her friends. She stated that Harville "was drinking their beer and he wasn't with them." The victim told Harville to leave the table and go to the other side of the club. Davis said Harville got up from his seat, threw his beer down on the table, and walked to the front of the club where he sat on a couch. The victim went to the couch and told Harville to leave the club. Harville insisted that he had done nothing wrong and that he was not going to leave. Davis said the victim grabbed Harville by the arm and ushered him outside. Davis testified that the victim was not physically or verbally abusive in removing Harville. After Harville was taken outside, Harville immediately reopened the door and asked the victim when he was leaving work that night. The victim asked why he was asking the question, and Harville responded, "'Because I'm going [to] come back and kill you.'" Davis said Harville then walked to a vehicle in the parking lot and sat in the driver's seat.

Davis testified that Harville sat in the vehicle for a few minutes before he started walking back towards the club. Davis said the victim was not armed with a gun that night, but he was able to obtain some mace. The victim stood outside of the entrance of the club and told Harville that he would be sprayed with mace if he continued to approach. Harville continued forward and was sprayed in the face with mace. Davis testified that Harville grabbed his face and walked away from the club across the parking lot towards a nearby highway. Davis did not see Harville get into a vehicle. Davis recalled that Harville walked away from the club at around midnight.

Davis' testimony was corroborated by another bouncer at The Farm, Jeffrey O'Dell Nix, Jr. Nix stated that after Harville was escorted out of the club, he walked to the back of the parking lot and entered a maroon vehicle. Nix believed that the vehicle was owned by another patron of the club. After being sprayed with mace, Nix said Harville threatened that he would be back. Harville then walked through the parking lot towards the highway. Nix did not see Harville get into a vehicle. Later, Nix told the victim to check on deejay

equipment that was being loaded onto a truck outside. Soon thereafter, Nix said he saw a Pontiac pull up and fire three gunshots towards the area where the equipment was being loaded.

Edward Carl Trotter testified that he worked as a doorman at The Farm on the night of the shooting. Trotter said that after Harville was sprayed with mace, Harville walked through the parking lot towards the highway. He recalled that Harville did not leave in a vehicle. Around 2:00 a.m., Trotter was by the entrance door when he saw a vehicle pull up to the club. He saw "something come out of the window" before three shots were fired from the vehicle. Trotter then ran to where the shots were fired and found the victim laying on his back.

The owner of The Farm, Jeffrey O'Dell Nix, Sr., testified Harville was dropped off at The Farm on the night of the shooting. He said the driver of the vehicle immediately drove away from the club. Nix, Sr. stated that around 12:15 to 12:30 a.m., after Harville was sprayed with mace, Harville yelled at the victim, "'Are you going [to] be here all night, you white M-F?'" Harville then added, "'Well, I'll be back to get you.'" Nix, Sr. said the shooting occurred a little after 2:00 a.m.

Toni Cattaneo testified that she was at The Farm with eight friends on the night of the shooting. She was on the dance floor when she decided to return to the table where her friends were sitting. Upon return, Cattaneo found Harville sitting in her chair. She asked Harville to get up, but he responded, "Fuck you." Cattaneo testified that she had never seen Harville before. She stated that Harville "didn't look right, like he was messed up or something. I don't know what you would call it. Crazy look, that's what I would say. Not intoxicated, but something." Cattaneo said Harville had bloodshot eyes and "[l]ooked like he was intoxicated on something, but not liquor." She had two of her friends speak with the bouncers who escorted Harville away from their table. She said the bouncers "seemed professional enough" in handling the situation.

Kerrie Thibodeaux testified that she arrived at The Farm with a friend around 11:30 p.m. She saw three or four bouncers standing outside who were telling Harville to leave the club. She stated that the bouncers and Harville "were kind of yelling at each other," but she did not see the bouncers physically touch Harville. Thibodeaux said she repeatedly heard Harville say he would be back. She also recalled that "[Harville] just said that he was going to get him and that he would be back and he was messing with the wrong one." Thibodeaux went into the club before the situation outside was resolved.

Heather Adkins testified that she went to The Farm between 9:30 p.m. and 11:00 p.m. She was outside talking on her phone when she saw a man being escorted out of the club. Adkins did not get a clear view of the man. Adkins said the man began yelling for the victim. When the victim came to the door, the man "told him that he was coming back."

The man also stressed that he did not understand why he was being told to leave. Adkins testified that the man then "walked away and said, 'That's fine, you'll see what's coming.'"

Barry Holland testified that he arrived at The Farm as a patron between 10:30 and 11:00 p.m. After about twenty-five minutes, he went outside and saw his friend, Harville, sitting in a vehicle in the parking lot. Holland said Harville wanted to know whether someone named Elizabeth was in the club. Holland testified that Harville also said he was going to kill a white person and showed him a shotgun in his car. Holland went inside the club to see whether Elizabeth was there. He again exited the club and informed Harville that Elizabeth was not inside. In speaking with Harville, Holland said he did not smell alcohol or any other odor, and Harville's eyes were not swollen. He said Harville looked completely normal.

Charlene Jamison Webb testified that she went to The Farm with her friend, Katherine Henderson, at around midnight. Henderson drove and Webb rode as a passenger. Upon arrival, Henderson parked next to an old, gray vehicle. Webb testified that Harville was sitting in the gray vehicle by himself. Webb and Henderson then entered the club. Henderson testified that she left the club during the night to get her camera. When she returned to her vehicle, she saw Harville still sitting in the gray vehicle by himself. Henderson said Harville tried to flirt with her, and said he had been kicked out of the club. Henderson testified that her encounter with Harville occurred about thirty minutes to an hour before the shooting.

Officer Scott Oates of the Covington Police Department testified that he was on patrol at 2:00 a.m. on September 15, 2007. Using a radar gun, he clocked Harville's gray vehicle traveling eighty-two miles per hour in a fifty-five miles per hour speed zone. Officer Oates pursued Harville's vehicle which turned onto a back road. Officer Oates activated his emergency lights after he saw Harville speed through a four-way stop. He noticed activity in Harville's vehicle which alerted him that Harville might have thrown something out of his car. Officer Oates pursued Harville for another mile until Harville finally stopped. After Harville was placed under arrest, Officer Oates found spent shotgun shells on the floorboard of Harville's vehicle. Officer Oates said the back road was later searched by the police and a shotgun was found in a roadside ditch. He testified that Harville had "a little smell" of alcohol when he was arrested.

Lieutenant Shannon Beasley of the Tipton County Sheriff's Office testified that she spoke with Harville soon after he was placed in custody by Officer Oates. She said Harville had an odor of alcohol but was not intoxicated. Lieutenant Beasley stated that Harville claimed to have been beaten at The Farm; however, she saw no obvious physical signs of an altercation. She testified that Harville admitted to throwing a shotgun out of his car while being chased by Officer Oates.

Detective Chris Williams of the Tipton County Sheriff's Office testified that he questioned Harville at the sheriff's office the morning of the shooting. Harville indicated that he had been beaten while at The Farm. Detective Williams said Harville's left eye was irritated and bloodshot, and it looked "somewhat swollen." He also noticed that Harville had a half-inch cut on the left side of his face. Detective Williams testified that Harville was not bleeding and did not have any gaping wounds.

The defense called Laneika Jackson as a witness. Jackson testified that she saw Harville being escorted out of The Farm on the night of the shooting. She believed that one of the security staff used "the 'N' word" in referring to Harville; however, she was unsure who used the derogatory term. Jackson said a bouncer had his hands on Harville and that there "was some shoving going on." She did not see what occurred after Harville was taken out of the club.

## ANALYSIS

**I. Sufficiency of the Evidence.** Harville claims his conviction for first degree murder was not supported by sufficient evidence of premeditation. He asserts that he was incapable of premeditation because he was intoxicated and had been in an altercation with the security staff involving mace. In response, the State contends the evidence was sufficient for a rational trier of fact to find him guilty of first degree premeditated murder. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn.1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

According to Tennessee Code Annotated section 39-13-202(a)(1), first degree murder includes the "premeditated and intentional killing of another." Premeditation is defined, under subsection (d), as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d) (2004). A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18) (2004).

The Tennessee Supreme Court has stated that "premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). The Court identified the following factors as supporting a finding of premeditation:

> The use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

Id. (citing Bland, 958 S.W.2d at 660). These factors, however, are not exhaustive. Id. The trier of fact may also consider evidence of the defendant's motive and the nature of the killing. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

We hold that the evidence, when examined in the light most favorable to the State, was sufficient to support the jury's finding that Harville's actions were premeditated. The proof at trial showed that several of the factors identified in Davidson were present. First, in Harville's sworn statement, he admitted to using a deadly weapon to ambush Rodgers. Harville stated:

> The security guard then came outside to his truck. I had a twelve-gauge shotgun, loaded, in the front seat, with buckshot. When the security guard came out, I pulled my car toward him. I then rolled down my window and shot him two or three times.

Multiple witnesses testified that Rodgers did not possess a weapon that night other than the mace used to spray Harville. Next, several witnesses testified that Harville made threats and declarations of his intent to kill Rodgers. For example, Holland testified that he spoke with Harville in the parking lot after Harville was ejected. Harville showed him his shotgun and said he was going to kill a white person. Furthermore, Harville conceded in his sworn statement that after being sprayed with mace, he sat in his car for seven or eight minutes and then "decided that I'm going to get that motherfucker." Evidence was also presented that Harville took steps to procure a weapon. The owner of The Farm testified that Harville was dropped off at the club that night Several staff members stated that after Harville was sprayed with mace, he walked off the premises towards the highway. Harville later reappeared in his gray Pontiac with a shotgun. Lastly, the State presented proof that Harville attempted to destroy evidence of the killing. Harville admitted in his sworn statement to throwing the shotgun out of his vehicle while attempting to evade arrest. Under the factors identified in Davidson, the jury's finding of premeditation was supported by the proof at trial.

Evidence was presented that Harville consumed alcohol on the night of the shooting and was sprayed with mace; however, we cannot conclude that Harville was incapable of premeditation. Based on the proof at trial, a rational jury could have found that it was Harville's conscious objective to kill the victim, and that he did so after the exercise of reflection and judgment. He is not entitled to relief.

**Conclusion**. Based on the foregoing, the judgment of the trial court is affirmed.

_____

CAMILLE R. McMULLEN, JUDGE