IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 5, 2014 Session



FILED
NOV 17 2014
Clerk of the Courts

**JERRY RAY DAVIDSON v. STATE OF TENNESSEE**

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Dickson County**
**No. CR-7386      Robert E. Burch, Judge**

---

**No. M2010-02663-SC-R11-PD**

---

GARY R. WADE, J., concurring in part and dissenting in part.

Initially, no words adequately describe the horrible nature of this murder. Nevertheless, I concur with the majority that a new sentencing hearing is warranted based upon the ineffective assistance of counsel at the penalty stage of the trial. Moreover, I believe that the deficiency in counsel's performance was such that an entirely new trial should be granted. In that regard, I dissent.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Likewise, article I, section 9 of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel." These constitutional provisions guarantee every defendant charged with a felony the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective assistance of counsel, however, a defendant must prove not only a deficiency in the performance of counsel but also that the deficient performance had a prejudicial effect upon the defense. Strickland, 466 U.S. at 687; Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). In my view, Jerry Ray Davidson (the "Petitioner") is one of the few who have been able to meet that burden as to both the guilt and the penalty phases of his trial.

The first prong of an ineffective assistance of counsel claim requires a showing "that counsel's representation fell below an objective standard of reasonableness," a level of performance measured by "professional norms" existing at the time of the trial or the appeal. Strickland, 466 U.S. at 688. The second prong requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Although a defendant cannot establish ineffective assistance based upon a failed strategy or an unsuccessful trial tactic, strategic and tactical choices are given deference only when counsel has conducted a reasonably adequate investigation prior to making such decisions. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)); see also Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) ("[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation."). Here, the trial attorneys, as the majority properly concludes, fell short in the exercise of their responsibilities.

The trial attorneys for the Petitioner pursued a theory of defense challenging the sufficiency of the State's evidence. The Petitioner's initial argument in this appeal is that his trial attorneys failed to timely investigate, obtain, and present medical evidence of the Petitioner's severe mental deficits, which, he insists, would have demonstrated that he was incapable of premeditation, an element essential to a first degree murder conviction. According to the Petitioner, the mental health professionals who testified at the evidentiary hearing on his claim for post-conviction relief established that his mental condition prevented him from forming an "intent to kill . . . prior to the act itself." Tenn. Code Ann. § 39-13-202(d) (Supp. 1995). Because the statute at the time of the offense defined premeditation as "an act done after the exercise of reflection and judgment," id., the Petitioner claims that the medical evidence available prior to trial, had it been properly investigated and presented, would have produced a verdict of murder in the second degree. The majority fully addresses the second issue on appeal—the claim that the Petitioner's attorneys were ineffective by failing to present mental health expert testimony as mitigating evidence during the penalty phase of his trial—and concludes that the medical proof, had it been presented, may have persuaded the jury not to return a death verdict. As I see it, however, the crux of the Petitioner's appeal is his first claim. He asserts that if his trial attorneys had conducted more than a superficial investigation of his medical history and had made an informed assessment as to the value of this evidence, there is a reasonable probability that the result of the guilt phase of the trial would have been different. Portions of the majority opinion demonstrate the Court's concerns about the quality of the representation:

> Although [the Petitioner's] attorneys obtained [mental health] records before trial, they did not share them with the neuropsychologist they had retained, [Dr. Pamela Auble]. Nor did they introduce any of these records at trial.
>
> Among the . . . [r]ecords [were] a CT scan of [the Petitioner's] head, performed on March 24, 1997. The opinion of the doctor who reported the scan was that [the Petitioner] had "[s]light prominence of the sulci, particularly

in the posterior fossa[,] compatible with mild atrophy." At [the] post-conviction hearing, psychiatrist Peter I. Brown explained that this finding meant that [the Petitioner] suffered from cerebral atrophy: "a significant shrinking . . . an actual decrease in the amount of brain tissue."

The . . . [r]ecords also contain a report of an EEG of [the Petitioner's] brain activity. The report identified an "[a]bnormal EEG because of a slight excess of asynchronous slowing in all quadrants." [At the post-conviction hearing,] Dr. Brown . . . explained . . . that this meant the electrical activity in [the Petitioner's] brain was "out of beat." This abnormality would interfere with [the Petitioner's] executive functioning and his ability to behave coherently.

[The Petitioner's] counsel also possessed [records] which chronicled [the Petitioner's] interactions with mental health professionals during the decades leading up to the murder. These records were examined (at least in part) by [Dr. Auble, the neuropsychologist,] and the mitigation specialist who counsel belatedly retained prior to trial. [Neither of these experts testified at the Petitioner's trial.]

[These records] reveal [the Petitioner] to be a very mentally disturbed individual. A 1979 letter from a forensic psychiatrist in Chattanooga to a state judge explains that [the Petitioner] "does have a rather serious defect of judgment based on his mental illness, which prevents him from being fully aware of the social consequences of all his behavior." A September 1980 social history report includes [the Petitioner's] self-report that he had been diagnosed with "undifferentiated schizophrenia" in the tenth grade.

. . . .

[Furthermore, one of the Petitioner's trial attorneys] explained that his office was overworked and understaffed in the months leading up to [the Petitioner's] trial.

(Emphasis added) (footnote omitted).

In assessing this proof, the majority focused almost entirely upon "the extent of defense counsel's duty to present mitigation evidence during the penalty phase of a capital murder trial," as indicated by the following comments:

After carefully reviewing the record, we have concluded that [the Petitioner] was prejudiced at his sentencing hearing by his counsel's ineffective assistance because his counsel failed to give the jury any mitigating information regarding [the Petitioner's] intellectual and cognitive deficiencies. Withholding this mental health information stemmed more from counsel's superficial investigation than from a legitimate strategic choice.

. . . .

At least one member of the jury could have decided that [the Petitioner] was less morally blameworthy (and thus undeserving of death) in light of his lifelong history of psychosis, his frontal lobe dysfunction, and the fact that his mental functioning was in some respects equivalent to that of a nine- or ten-year old child. These post-conviction revelations sufficiently undermine our confidence in the verdict to merit post-conviction relief. We find a reasonable probability that, but for counsel's failure to present psychological mitigation evidence, the result of the sentencing trial would have been different.

(Emphasis added.) The only reference by the majority to the guilt phase of the trial is as follows:

[W]e agree . . . that counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial. [Davidson v. State, No. M2010-02663-CCA-R3-PD, 2013 WL 485222, at *19-20 (Tenn. Crim. App. Feb. 7, 2013)]. Counsel was legitimately concerned that presenting any psychological evidence could open the door for the State to show the jury the alarming statements from [the Petitioner's] mental health records that revealed his malignant misogyny and his propensity to commit sexual violence. Ensuring that this evidence remained inadmissible was a reasonable strategy.

(Emphasis added.)

While the majority has properly ruled that the failure of trial counsel to present mental health evidence as mitigation during the penalty phase resulted in prejudice to the Petitioner, I believe that the same rationale should extend to the guilt phase of the trial. Because of their inadequate preparation as to the Petitioner's medical history, his trial attorneys were unable to make an informed choice to forgo the presentation of this important evidence at trial. As stated, premeditation is an essential element of first degree murder. Severe mental defects might be considered by a jury as having an adverse effect upon the ability to exercise

-4-

"reflection and judgment" as required by statute. Absent the errors by trial counsel, there is, in my view, a reasonable probability that a second degree murder conviction may have been the result.

Counsel's failure to timely investigate and present the mental health history of the Petitioner in the guilt phase of the trial is particularly disturbing because, on the direct appeal of the conviction, this Court divided 3–2 on the issue of whether the proof, which was devoid of any reference to mental health evidence, established first degree premeditated murder or a less culpable mental state. In the 2003 opinion, the majority of this Court, after noting that "[a]ll of the evidence regarding [the Petitioner's] role in the killing [was] circumstantial," State v. Davidson, 121 S.W.3d 600, 606 (Tenn. 2003), described the evidence as marginally sufficient to establish the essential element of premeditation:

> Although the question is close in this case, we believe that the evidence is sufficient for a rational trier of fact to have found the element of premeditation beyond a reasonable doubt. . . .

> While there is no direct evidence that [the Petitioner] intended to kill [the victim] when they left the bar together on the night of September 26, 1995, circumstantial evidence supports the jury's verdict.

> . . . .

> [W]hile no single piece of evidence was sufficient in and of itself to establish premeditation in this case, we believe that the facts and circumstances as a whole were sufficient for a rational trier of fact to have found the elements of premeditated first degree murder beyond a reasonable doubt.

Id. at 615-16 (emphasis added).

Two justices, however, lodged separate dissents to the affirmance of the first degree murder conviction because of the lack of evidence of premeditation. Id. at 625 (Anderson, J., dissenting); id. at 629 (Birch, J., dissenting). Justice Anderson expressed his view as follows:

> In my view, the evidence was insufficient to sustain the conviction for first degree murder because there was no evidence of the [Petitioner's] planning, the [Petitioner's] prior relationship with the victim, the cause or manner of the victim's death, or any other evidence from which a rational trier of fact could

> have inferred beyond a reasonable doubt that the crime was premeditated, *i.e.*, committed "after the exercise of reflection and judgment."
>
> . . . .
>
> There was . . . no evidence that the [Petitioner] procured a weapon in advance for the purpose of killing the victim, made preparations to conceal the killing before it was committed, or exhibited a calm or cool demeanor immediately after the killing. [E]vidence supporting the factors we have traditionally relied upon in analyzing premeditation was absent in this case.

Id. at 625-26 (Anderson, J., dissenting) (emphasis added) (citations omitted).

Likewise, Justice Birch dissented as to the issue of premeditation, expressing his view as follows:

> I write separately to dissent from the majority's holding that the evidence in this case is sufficient to establish premeditation . . . .
>
> In my view, . . . the proof of premeditation is woefully lacking. The proof as I view it not only fails to show premeditation, but demonstrates instead that the homicide resulted from impulsive behavior.
>
> There was not even one scintilla of evidence in the record that the [Petitioner] engaged in any preparation or planning for this crime.
>
> . . . .
>
> [N]othing, . . . in [the Petitioner's] conduct reflects a calm or reflective mental state—either before or after the murder. If anything, []his conduct suggests extreme irrationality.

Id. at 629-31 (Birch, J., dissenting).

Thus, years before the actual extent of the Petitioner's mental deficiencies became known through this post-conviction proceeding, the two dissenting justices specifically targeted the lack of evidence to prove premeditation. At the evidentiary hearing on the post-conviction claim, a psychiatrist and neuropsychologist testified that the Petitioner experienced a thinking disorder, schizophrenic tendencies, and severe cognitive defects that impaired his ability to either plan or prepare outside of a structured environment. The State

-6-

did not offer proof to the contrary. Dr. Brown, the psychiatrist, testified that the Petitioner's mental defects interfered with his "executive functioning," which involves "the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. It [also] involves a person's ability to develop and carry out plans . . . ." In re Conservatorship of Groves, 109 S.W.3d 317, 337 & n.78 (Tenn. Ct. App. 2003). Dr. Brown further concluded that, in his assessment, the Petitioner was incapable of premeditating the victim's murder. This evidence, while critically important for the defense in the penalty phase of the trial, would be no less important in the guilt phase of the trial.

In summary, I concur in the majority's determination that trial counsel's failure to adequately investigate the mental health records of the Petitioner warrants a new sentencing hearing. Because, however, the same lack of preparation precluded the jury from hearing critical proof at trial, I maintain that the Petitioner also established ineffective assistance of counsel as to the guilt phase. In my view, there is a reasonable probability that the verdict may have been different. I would, therefore, vacate the first degree murder conviction and the sentence of death and remand for a new trial.

GARY R. WADE, JUSTICE

-7-